STATE

v.

William CREIGHTON.

No. 82–331–C.A.

Supreme Court of Rhode Island.

July 27, 1983.

through disability symptoms.

---

1. It is not disputed that the disease may have been contracted prior to its becoming manifest

Dennis J. Roberts II, Atty. Gen., Joseph P. Ippolito, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Asst. Public Defender, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, William Creighton (Creighton), is before us on an appeal following the return of guilty verdicts against him by a Superior Court jury on charges that he had committed first-degree sexual assaults against his stepson and his own sister during the latter part of 1980. The stepson incident occurred during the evening hours between December 5 and December 6, and his sexual involvement with his sister took place in the month of November, sometime between the tenth and the thirtieth.

At the time in question, Creighton and his wife, Lorraine, lived in a duplex house situated on Hillard Street in Providence. Also living at the Creighton residence was Robin, Creighton's seventeen-year-old married sister, and three of Lorraine's children by a previous marriage, nine-year-old John, ten-year-old Bobby, and three-year-old Sherry. The upper floor of the duplex consisted of three bedrooms: one belonged to Creighton and his wife; another was occupied by John, who slept there with his brother Bobby; and the third bedroom was Sherry's exclusive domain. Robin slept downstairs on the living-room couch.

Robin testified that sometime during a twenty-day period in November 1980 her brother woke her up from a sound sleep and raped her. Robin told no one about the incident until the following month. She explained her silence by saying that she was afraid of her brother and wanted to remain

in the house because she "felt sorry for the kids."

John testified that sometime around 4 a.m. on December 6, 1980, he was awakened by noise coming from downstairs in either the kitchen or the parlor, and subsequently, John explained, he and his stepfather went upstairs to the Creighton bedroom where, in John's words, Creighton "stuck his penis up my rear end."

In his appeal Creighton first claims that the trial justice erred when he allowed a member of the Providence police department to testify concerning what John told him when the police arrived at the Creighton home at approximately 6 p.m. on December 6, 1980.

Robin was the catalyst that made the police aware of what was going on at the Creighton home. At approximately 5:30 p.m. on December 6, 1980, a patrolman, in responding to a call, went to a phone booth situated near an Olneyville Square car wash and there talked with Robin. The patrolman then summoned his sergeant, who in turn contacted the department's Juvenile Division.

One of the department's juvenile specialists was Detective Thomas F. Blessington. Upon his arrival, the police and Robin drove over to the Creighton duplex. Detective Blessington told the jury that once he arrived on the premises, he took John into a separate room and asked him what had happened. The officer acknowledged that after he had made the initial inquiry, John broke down and cried and denied that anything had happened and then became very emotional. John, the officer said, was very scared at the time but, after receiving the detective's reassurance, told the officer what had occurred. The officer testified that John said that Creighton had come into John's room and brought him into Creighton's room. There he was told to take off his clothes and lie on the bed. Creighton removed his clothes, got onto the bed, and proceeded with an "act of anal intercourse

and sodomy on the child." The detective acknowledged that the phrase an "act of anal intercourse and sodomy" was his and not John's.

Creighton argues that John's conversation with the detective cannot be considered within the so-called "spontaneous-utterance" exception to the rule barring the use of hearsay evidence. The trial justice thought otherwise, and so do we.

■ The admissibility of statements purporting to be spontaneous utterances is a matter directed to the sound discretion of the trial justice. Strict contemporaneity is not required. Generally speaking, a less demanding time requirement is necessary in sexual-offense cases, particularly when the victim is a child of tender years. The trial justice must determine from all the facts whether the declarant, when he spoke, was laboring under the stress of nervous excitement. *State v. Souza*, R.I., 456 A.2d 775, 778 (1983); *State v. Potter*, R.I., 423 A.2d 67, 68 (1980); *State v. Jalette*, 119 R.I. 614, 619, 382 A.2d 526, 529 (1978). The fact that the statement was made in response to an inquiry does not render the spontaneous-utterance doctrine inapplicable. *State v. Elzie*, 351 So.2d 1174 (La.1977); *State v. Simmons*, 52 N.J. 538, 247 A.2d 313 (1968); Annot., 80 A.L.R.3d 369 (1977).

In placing this issue in its proper time frame, we would first point out that Robin was clearly in error when she said the sodomy incident occurred in November and at 5 p.m. She acknowledged that during the late hours of the morning of December 6 she walked over to her mother's home and told her mother what had happened to John earlier that day at the Creighton domicile. Later that afternoon she went to the carwash phone booth and called the police. Everybody agrees that the call and the conference with the police took place on the evening of December 6, 1980.

■ An insight into John's state of mind can be obtained by reviewing his testimony.

John told the jury that when he left Creighton's bedroom to return to his bedroom, Creighton told him not to tell anybody. When asked what Creighton would do if the sodomy incident did not remain a secret, John replied, "He would have killed me." When asked if he believed this threat, John said, "Yeah." Cross-examination made it clear that he would never reveal what went on in the bedroom so long as he lived with Creighton because he "would get a beating."

It is obvious from this record that when John spoke with Detective Blessington, he was still laboring under the stress of a terrifying experience and at a time when he had no intent whatsoever to misrepresent. To the contrary, his initial denial of any wrongdoing on Creighton's part is concrete proof that as John and the detective began their conversation, he was ever aware of the necessity of keeping his mouth shut because otherwise he would risk a beating from Creighton.

In *State v. Nordstrom,* 104 R.I. 471, 476, 244 A.2d 837, 840 (1968), we stressed that, in determining spontaneity, we would eschew any approach to this issue which calls for a blind obedience to a clock and an hour-by-hour count of the time that has passed between the event and the declaration. The crucial question, we said, is whether from a consideration of all the facts the trial justice is satisfied that the declarant was still laboring under the stress of the nervous excitement when he or she spoke.

We have no doubt that when John first met Detective Blessington and was afforded the opportunity to converse, he was aware that a frightfully hideous and revolting experience was over. We also have no doubt that his statements were an instinctive outpouring that resulted from the traumatic events detailed in this opinion. In our opinion, his statements made to Detective Blessington amounted to spontaneous utterances, and the trial justice properly received the challenged testimony into evidence.

■ The remaining portion of Creighton's appeal concerns the trial justice's refusal to charge the jury that it was not obligated to believe uncontradicted testimony of an unimpeached witness, but rather the jury could reject such testimony on the basis of the witness's bearing and demeanor or because the testimony was inherently improbable or "for other reasons sufficient to you, that such testimony is not worthy of belief." The request was based on a recommended charge found in Devitt and Blackmar, *Federal Jury Practice and Instructions,* § 17.21 (3d ed. 1977).

Recently, in *State v. D'Alo,* R.I., 435 A.2d 317 (1981), we once again stressed that a defendant is entitled to a charge that explains and informs the jury of the relevant propositions of law, but we also emphasized that when the request to charge is adequately covered by the instructions given to the jury, a refusal to comply with the defendant's request is not error. *Id.* 435 A.2d at 319–20. In charging the jurors about their task in assessing the credibility of witnesses, the trial justice listed the following factors that they were to consider: the witness's appearance, the manner in which the testimony is given, the apparent frankness and candor of the witness, the witness's interest or lack of interest in the outcome of the case, the presence of corroborating or contradictory evidence, and any inconsistencies between what was testified to in the courtroom and spoken about elsewhere. The trial justice also reminded the jurors that it was their duty to evaluate the evidence and to afford to the testimony of the witnesses such weight as in their judgment was warranted. He stressed that they were to weigh the evidence without regard to whether it came before them by direct testimony or on cross-examination. In concluding his charge, he reminded the jurors that if it was their unanimous belief that the state had proved Creighton's guilt

beyond a reasonable doubt, they should not hesitate to report their verdict of guilt to the court; but by the same token if the jurors felt that the state had not sustained its burden of proof, they were not to hesitate to return a not-guilty verdict. It is our belief that the trial justice's remarks amply explained to the jurors what they were to do once they entered the jury room and took on the job of factfinders. Although there is much to be said for the charge set out in the form book, we cannot fault the approach taken by the trial justice.

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.[1]

1. Before imposing sentence, the trial justice gave Creighton his right of allocution. At that point Creighton told the trial justice: "I had no realization what I did that night at all. * * * I was all drugged up. I didn't even know where I was that night, you know, and that's it. I just ain't doing no more drugs or alcohol."