**STATE**

**v.**

**James OLIVEIRA.**

**No. 2007–30–C.A.**

Supreme Court of Rhode Island.

Dec. 19, 2008.

Jane McSolely, Office of the Attorney General, for Plaintiff.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The dispositive issue in this appeal is whether a jailhouse interview by a child protective investigator concerning an allegation of child molestation implicates the right to counsel of a defendant already charged with committing the same act of molestation. In the context of this case, we conclude that it does, and thus we hold that the trial justice improperly admitted at the defendant's trial the statement that the defendant made during the interview.

The defendant, James Oliveira, was convicted by a jury of first-degree child molestation. He appeals from the judgment on three grounds. First, he contends that the trial justice erred by not excluding from evidence a statement that a child protective investigator obtained in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution and under article 1, sections 10 and 13, of the Rhode Island Constitution. Second, he argues that the trial court erred in allowing into evidence hearsay statements that the alleged victim made to his mother.

Third, he asserts that he was denied the right to a speedy trial under the Sixth Amendment and article 1, section 10, of the Rhode Island Constitution. For the reasons set forth in this opinion, we vacate the judgment of conviction and remand the case to the Superior Court for a new trial.

## I

### Facts and Procedural History

In August 2004, defendant was residing with his daughter, Barbara, his daughter's boyfriend, Richard, and their two young sons, six-year-old Phillip and one-year-old Thomas, in Pawtucket, Rhode Island.[1] The defendant often shared a double bed with Phillip in the boys' bedroom; Thomas still slept in a crib.

On the evening of August 11, 2004, Phillip's parents went grocery shopping, leaving their sons with defendant. This was fairly common, according to Barbara, who testified that her father frequently babysat her children and enjoyed a good relationship with Phillip. Phillip also testified that he was fond of spending time with defendant, who played games and took bike rides with him.

Phillip told the jury that after his parents left the house that night and as he was lying in bed, his grandfather came into his room, laid down on the bed, and "put his finger in my bum." Phillip said he told his grandfather to stop because it hurt, and defendant did so. He also testified that the next morning he was awakened when he again felt something penetrate him. This time he said nothing to his grandfather, who left shortly thereafter for work, at about 7 a.m.

On the morning of August 12, 2004, at around 9:30 or 10 a.m., while Barbara still

---

1. In an effort to afford the alleged victim a measure of privacy, we use fictitious names to identify him and his immediate family.

was in bed, Richard told her that he had come out of the bathroom and saw Phillip in the kitchen wiping his behind with a paper towel. Barbara testified that she summoned Phillip to her bedroom to ask him for an explanation for his behavior, and he replied that he felt like he needed to go to the bathroom, but was able to void only water. Barbara testified that Phillip appeared scared and nervous, that he was "pulled back, really quiet, almost like he was afraid to talk," with "big eyes." She admonished the child that such behavior was inappropriate in the kitchen and should be confined to the bathroom and then sent him to his room.[2]

Disturbed by her son's behavior, Barbara shortly thereafter followed him into his bedroom, where she found him sitting on his bed with his baby brother. After his mother urged him to tell her whether something was wrong,[3] Phillip responded that she was "going to be mad at grandpa." According to his mother, Phillip said that when he was lying in bed, his grandfather "was hugging him," then pulled his pants down and rubbed his leg, before "[his grandfather] licked his thumb and then stuck it in [Phillip's] bum." Barbara immediately called the police.

Pawtucket Police Detective John McIlmail arrived at their home around noon.

After speaking with Barbara and Phillip about what allegedly had happened and asking Barbara to write out a witness statement, Det. McIlmail had Barbara call her father on a pretext so that the police could question him. Barbara called defendant at work and asked him to come home to drive her to an eye doctor's appointment. She then took her son to Hasbro Children's Hospital for an evaluation.

When Mr. Oliveira arrived at his daughter's residence, the officers placed handcuffs on him and took him to the police station. At the station, Det. McIlmail informed defendant of his *Miranda* rights,[4] and defendant gave a written statement in which he expressed remorse for having inserted his index finger into Phillip's anus.

Christine Barron, M.D., a pediatrician at Hasbro Children's Hospital and a clinical director of the Child Protection Program, examined Phillip. Despite Phillip's disclosure of anal penetration to her, she concluded that the anal examination of the child was normal, a result that neither confirmed nor eliminated the possibility of abuse.[5] Doctor Barron obtained a rectal swab from Phillip and submitted it to the Rhode Island Department of Health Laboratory. Tests conducted there by forensic biologist Sharon Mallard revealed the

---

2. Barbara and Phillip's respective testimonies regarding the sequence of events in the morning are somewhat inconsistent. For instance, Phillip never testified to going into the kitchen or wiping his behind that morning. At some points, he said that he went straight to his mother's room in the morning to tell her what happened. At other points, he said he went into the bathroom before seeing his mother.

3. Barbara testified as follows:

"I went in there to talk to him and I said, 'You know, [Phillip], if you're having some kind of problem with your bum that you're not telling me, you need to tell me. I'm

your mom. You need to tell me if you're having any kind of problems, if you can't go poop or if it hurts or something is the matter, or somebody touched you. If anything is the problem, you have to tell. Mommy won't be mad at you, I promise. You won't get punished. You just need to tell mom if you have any problems.' "

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The doctor explained that due to the elasticity of the anal sphincter muscle, sexually abused children still may manifest normal results, even when examined within hours of penetration.

presence of seminal fluid in the swab. Ms. Mallard later concluded, after obtaining defendant's DNA sample, that the DNA extracted from the seminal fluid matched defendant's DNA profile.

The state filed a complaint against Mr. Oliveira on August 13, 2004, the same day on which he was presented in District Court, referred to the Public Defender's Office, and held without bail.[6] The court also entered a no-contact order and referred the matter to a grand jury. On October 29, 2004, defendant was indicted on two counts of first-degree child molestation in contravention of G.L.1956 §§ 11–37–8.1 and 11–37–8.2. Count 1 charged that sometime on August 11–12, 2004, defendant committed an act of "sexual penetration, to wit, anal intercourse," with a person fourteen years of age or under. Count 2 charged him with committing the same act between August 1–10, 2004. Mr. Oliveira was arraigned in Superior Court on November 17, 2004.

■ The trial justice heard pretrial motions on September 13 and 14, 2006. He considered defendant's motion to suppress his custodial statements to the Pawtucket police after his arrest,[7] his motion to ex-

clude statements he gave to a child protective investigator with the Department of Children, Youth and Families (DCYF) at the Adult Correctional Institutions (ACI), and his motion to exclude evidence of his prior conviction for second-degree child molestation if he chose to testify.[8] The trial justice denied all motions.

The trial commenced and, on September 19, 2006, the jury returned a guilty verdict on count 1 and an acquittal on count 2. On September 29, 2006, the trial justice heard and denied defendant's motion for a new trial, and he subsequently sentenced Mr. Oliveira to sixty years imprisonment, with forty years to serve, the remainder suspended, with probation. The defendant timely filed a notice of appeal.[9]

Additional facts will be discussed in the context of the issues raised on appeal.

## II

### Discussion

#### A.

#### Statement Obtained by Child Protective Investigator

The defendant's first contention on appeal is that the introduction of a statement

---

6. The defendant's counsel represented at a pretrial hearing that a bail hearing was waived.

7. Although Mr. Oliveira did not testify at trial, he did take the stand at a suppression hearing challenging the admissibility of his written statement. He told the court that he asked for an attorney several times before he admitted guilt, but was told he did not need one because "an attorney is not going to help you now." The defendant said that he was handed a pad and pen; the officers dictated the incriminating statement to him, then insisted that he sign it. He said he complied because he was intimidated by the implied threat in the officers' statement that "we can do this the easy way, or the hard way." He testified that he did not initial and sign the *Miranda* rights form until after the police disregarded

his requests for counsel and they finished dictating the statement and had him sign it. The trial justice disbelieved defendant and found the statement was freely and voluntarily given. The defendant does not contest the admission of his statement to police on appeal.

8. Because Mr. Oliveira ultimately did not take the stand before the jury, this issue cannot be raised on appeal for want of preservation. *See State v. Silvia*, 898 A.2d 707, 720 (R.I. 2006).

9. Although defendant filed a notice of appeal before the judgment of conviction was entered, on January 23, 2007, we treat the premature appeal as if it had been filed properly. *State v. Hesford*, 900 A.2d 1194, 1197 n. 3 (R.I.2006).

obtained by a child protective investigator with the DCYF violated his right against self-incrimination and right to counsel under the United States and Rhode Island Constitutions. Laurie Moriarty, a DCYF child protective investigator, was assigned to Phillip's case. Ms. Moriarty testified that her job involves "receiving and investigating reports of child abuse and neglect and assessing risk and the danger that children are in." The DCYF has a statutory duty to investigate all reports of alleged child abuse or neglect. G.L.1956 § 40–11–7(a). The goals of a DCYF investigation are to determine the validity of reported allegations and to assure the safety and well-being of children. State law requires that DCYF have personal contact with the child named in the report. *Id.* It is DCYF policy, although not statutorily required, that investigators interview each involved adult, including alleged perpetrators. R.I.Code R. 03 005 001 § 500.0050. It is also DCYF protocol to work in conjunction with law enforcement personnel. According to a DCYF procedure and policy manual,

> "[i]t is of utmost importance that investigative workers develop rapport with law enforcement personnel, as their assistance and support is essential in many parts of the investigative process, including: reporting[,] locating suspects[,] taking protective custody[, and] obtaining evidence. The Department must notify the police of all Priority 1 allegations received to request their cooperation and/or assistance." [10]

If DCYF has reasonable cause to suspect child abuse or neglect, it is required by statute to forward any related information to the appropriate law enforcement agency. Section 40–11–7(f).

On August 24, 2004, Ms. Moriarty went to the Child Advocacy Center (CAC), where she interviewed Phillip and his mother, and met with the detectives and prosecutor involved in this case. [11] At the CAC, Ms. Moriarty gave Det. McIlmail the names of other families and victims who might have been abused by Mr. Oliveira, and the detective gave her a copy of the police report concerning defendant. In her report, Ms. Moriarty stated that, based on the CAC interviews, "[t]here appears to be enough evidence for the attorney general's office to press charges."

The next day, August 25, 2004, Ms. Moriarty went to the Intake Center at the ACI to interview defendant. Before speaking with him, she neither ascertained whether he was being held with or without bail, nor whether he was represented by counsel. Ms. Moriarty testified that it is DCYF policy not to talk to attorneys "because of confidentiality," nor is it DCYF policy to ask attorneys of record for permission to see their client. According to Ms. Moriarty, during the interview at the ACI, Mr. Oliveira admitted that he sexually molested his grandson. At trial, after refreshing her memory by reviewing her report, she told the jury that defendant "stated that he spread [Phillip's] hole with his fingers to loosen him up and then he put his penis

---

**10.** Priority 1 allegations include allegations of sexual molestation. R.I.Code R. 03 005 001 § 500.0050.

**11.** The CAC is a program of Day One, The Sexual Assault & Trauma Resource Center, whose mission is to provide a coordinated effort among professionals and agencies dealing with child sexual abuse cases. The CAC's website states: "The CAC teams with police, the Attorney General's Office, Department of Children, Youth, and Families (DCYF), victim advocates, medical professionals, and mental health providers to help children and families who have experienced the abuse of a child." *See* "What is the CAC?" at http://www.dayoneri.org/whatiscac.htm. Last visited December 18, 2008.

inside the child and rammed him, and the child asked him to stop because it hurt." Ms. Moriarty also testified that child protective investigators speak with alleged perpetrators "[i]n case they have something further to say that can add to the evidence, and there have been incidences [sic] where I've learned new things when I talked to the perpetrator."

On appeal, defendant argues that Ms. Moriarty was a government agent working in concert with law enforcement in this case. As such, he argues, she was required to "Mirandize" him and notify his attorney before she questioned him at the ACI. The state maintains that it is unnecessary for this Court to reach this issue because the admission of Mr. Oliveira's statement, even if erroneous, did not prejudice defendant. It argues, alternatively, that *Miranda* and right-to-counsel concerns were not implicated in this case because Ms. Moriarty's role in interviewing defendant was not prosecutorial in nature.

### 1. Right to Counsel

■ We begin our analysis with defendant's argument that the statement he gave to Ms. Moriarty violated his right to counsel, and thus was admitted erroneously by the trial justice. This Court undertakes a *de novo* review of questions of law, as well as mixed questions of law and fact, that involve issues of constitutional dimension. *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 464 (R.I.2008); *State v. Monteiro*, 924 A.2d 784, 790 (R.I. 2007).

■ Both the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that the accused shall enjoy the right to the assistance of counsel for his defense in all criminal prosecutions.[12] The Sixth Amendment right to counsel "attaches at least when the defendant first appears before a judicial officer," *United States v. Boskic*, 545 F.3d 69, 81 (1st Cir. 2008)—that time when the accused has been informed of a formal accusation against him and restrictions are imposed on his liberty. *Rothgery v. Gillespie County, Texas*, — U.S. —, —, 128 S.Ct. 2578, 2581, 171 L.Ed.2d 366 (2008); *see Kirby v. Illinois*, 406 U.S. 682, 689–90, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (Sixth Amendment right to counsel attaches at that time when "the government has committed itself to prosecute * * *. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.").[13] A defendant then is entitled to

---

12. The Sixth Amendment right to counsel has been incorporated in the Due Process Clause of the Fourteenth Amendment and is thus binding upon the states. *Danforth v. Minnesota*, — U.S. —, —, 128 S.Ct. 1029, 1035, 169 L.Ed.2d 859 (2008); *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (applying the Sixth Amendment right to counsel to the states). Thus, the State of Rhode Island must uphold the minimal guarantees afforded by the United States Constitution. "[A] state is free, in interpreting its own * * * constitution, to impose greater restrictions to protect its citizens against governmental intrusions, even if the state and federal provisions are similar." *State v. Innis*, 433 A.2d 646, 656 (R.I.1981)

(citing *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)). In this case, we conclude that defendant's right to counsel under the Sixth Amendment of the United States Constitution was violated. For this reason, we need not delve into any further interpretation of the right to counsel under the Rhode Island Constitution.

13. The United States Supreme Court has long established that the accused needs the "guiding hand of counsel" not only at trial but long before during the pretrial phase. *Escobedo v. Illinois*, 378 U.S. 478, 486, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (citing *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)); *see Massiah v. United States*, 377

the assistance of counsel at all "critical stages" of the prosecution. *Iowa v. Tovar,* 541 U.S. 77, 80–81, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *United States v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). A stage of the prosecution is "critical" when substantial rights of a criminal accused may be endangered by that proceeding or event. *Brewer v. Williams,* 430 U.S. 387, 425, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

■ The United States Supreme Court has held that a post-formal-charge interrogation by police or an agent of the state is a "critical stage" of the prosecution in which the accused is entitled to counsel. *Maine v. Moulton,* 474 U.S. 159, 169–70, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 270–71, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 205–06, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *see also Estelle v. Smith,* 451 U.S. 454, 469–70, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The accused has the right "not to be confronted by an agent of the State regarding matters as to which the right to counsel has attached without counsel being present." *Moulton,* 474 U.S. at 178 n. 14, 106 S.Ct. 477. Any statement that a state agent deliberately elicits from the defendant in derogation of the right to counsel is inadmissible at his criminal trial. *Id.* at 174, 106 S.Ct. 477; *accord State v. Mattatall,* 525 A.2d 49, 52–53 (R.I.1987).

■ In the present case, defendant's right to counsel clearly had attached by the time the state filed a complaint against him on August 13, 2004, and he was held without bail. Thereafter, any interrogation of defendant by an agent of the state constituted a "critical stage" of the prosecution, requiring the presence or notifica-

tion of counsel. Thus, the determinative issue before us is whether Ms. Moriarty was an agent of the state for purposes of implicating defendant's right to counsel. We answer this question in the affirmative.

■ Under the Sixth Amendment, an "agent of the state" is not limited to police and their express agents. We have observed that the Supreme Court of the United States has rejected arguments that the Sixth Amendment right to counsel can only be violated when the police arrange a confrontation with the accused after the right to counsel has attached. *Mattatall,* 525 A.2d at 51–52 (citing *Moulton,* 474 U.S. at 164, 106 S.Ct. 477 (the defendant arranged a meeting with a co-suspect, who cooperated with the police as a government informant); *Henry,* 447 U.S. at 269, 274, 100 S.Ct. 2183 (rejecting solicitor general's argument that a Sixth Amendment violation requires affirmative interrogation by the government); and *Massiah,* 377 U.S. at 202–03, 84 S.Ct. 1199 (information about who set up the meeting with the defendant not even mentioned in the opinion)). In *Moulton,* 474 U.S. at 174, 106 S.Ct. 477, the Court explained, "the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry.*"

The Court held in *Estelle,* that the Sixth Amendment required the exclusion of incriminating evidence obtained during a court-ordered psychiatric examination of the defendant in prison after the defendant's indictment and appointment of counsel. *Estelle,* 451 U.S. at 456–57, 470, 473, 101 S.Ct. 1866. The state trial court in that case ordered a psychiatric evalua-

---

U.S. 201, 205, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)

(pretrial confrontation and proceedings "might well settle the accused's fate and reduce the trial itself to a mere formality").

tion to determine the defendant's competency to stand trial. *Id.* at 456–57, 101 S.Ct. 1866. The psychiatrist, who concluded that the defendant was competent to stand trial, later was called by the prosecution to testify at the sentencing hearing on the defendant's "future dangerousness."[14] *Id.* at 458–60, 101 S.Ct. 1866. The Supreme Court found that the psychiatrist was acting as an agent of the state when he testified at the hearing:

"That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase * * * his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."[15] *Id.* at 467, 101 S.Ct. 1866.

Significantly, the question of whether a Sixth Amendment violation occurred did not turn on the purpose of the psychiatrist's interview. The Court recognized that the psychiatric examination was performed for the limited, neutral purpose of determining competency. *Id.* What mattered only was that the state proceeded to use the fruits of that evaluation adversely against the defendant. *Id.* at 465, 101 S.Ct. 1866. Because the "interview proved

to be a 'critical stage' of the aggregate proceedings against [the defendant]," the Court concluded the defendant had a Sixth Amendment right to the assistance of counsel before submitting to a pretrial psychiatric evaluation.[16] *Id.* at 469–70, 101 S.Ct. 1866.

In the case at bar, defendant's Sixth Amendment right to counsel had attached no later than his initial presentation in District Court when he was referred to the Public Defender's Office and held without bail. *See Rothgery,* 128 S.Ct. at 2585–86 (reiterating that the right to counsel attaches at the initial appearance, even if it comes before an indictment or formal arraignment). Although Ms. Moriarty did not interview defendant at the direct behest of the police or prosecution, she had met and exchanged information with them on the previous day as part of the CAC multidisciplinary "team." Moreover, DCYF protocol required that she work cooperatively with law enforcement personnel. As Ms. Moriarty acknowledged at trial, one of her purposes in interviewing defendant was to "add to the evidence." Significantly, she was statutorily required to forward any information she may obtain from defendant concerning child abuse to the police. Section 40–11–7(f).

We recognize that Ms. Moriarty's role as a child protective investigator was not primarily prosecutorial; rather it was to protect children who might have been at

---

**14.** The prosecution was seeking the death penalty, which, in Texas, required an assessment of the defendant's "future dangerousness." *Estelle v. Smith,* 451 U.S. 454, 457–58, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

**15.** In *Estelle,* the Supreme Court found that the psychiatrist was "an agent of the State" for purposes of the Fifth Amendment. *See Estelle,* 451 U.S. at 465–69, 101 S.Ct. 1866. The Court reached the Sixth Amendment question after its finding of a Fifth Amendment violation, and did not readdress the

question of agency. *See id.* at 469–71, 101 S.Ct. 1866. It is evident that the Court's agency analysis applied likewise to its finding of a Sixth Amendment violation.

**16.** The Supreme Court did not find any constitutional right to have counsel actually present during the evaluation. It held that the defendant had a right to consult with his attorney prior to that evaluation. *See Estelle,* 451 U.S. at 470 n. 14, 101 S.Ct. 1866.

risk due to defendant's suspected abuse. Typically, when a DCYF investigation supports an abuse allegation, the usual result is the filing by DCYF of child abuse and/or neglect petitions. These are civil proceedings in which Sixth Amendment guarantees do not apply. It is clear to us, however, that Ms. Moriarty deliberately intended to elicit incriminating evidence from defendant, which she knew she would then be required to turn over to the police, especially considering her awareness that a criminal prosecution had begun. We hold, therefore, that Mr. Oliveira "was denied the basic protection of [the right to the assistance of counsel] when there was used against him at trial evidence of his own incriminating words." *Moulton*, 474 U.S. at 173, 106 S.Ct. 477 (quoting *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199).[17]

■ Our holding is not intended to stifle or limit the important work of the

DCYF in protecting the safety of children. As stated by the Oklahoma Court of Criminal Appeals:

"The protection of the child does not necessarily include the prosecution of abusers. This Court is quite aware of the necessity of frank and open dialog between [DCYF] investigators, parents, victims and accused persons, so that the child protection goal can be achieved. We have no qualms with [DCYF] investigators getting statements related to child abuse; however, when these statements are used in a criminal proceeding, the constitutional rights of an accused must also be protected." *Blanton v. State*, 172 P.3d 207, 211 (Okla.Crim.App. 2007).

If the state wishes to use such statements in a criminal trial, therefore, it is incumbent upon the prosecution to ensure that the defendant's Sixth Amendment right to

---

**17.** We note that two cases with factual scenarios similar to the case at bar were decided by state intermediate courts of appeal on Sixth Amendment grounds. In *State v. Dixon*, 916 S.W.2d 834, 835, 837 (Mo.Ct.App.1995), the Missouri Court of Appeals held that a social worker who privately interviewed the defendant in jail was a government agent and violated the defendant's Sixth Amendment right to counsel. In that case, two jail interviews with the social worker took place after the state charged the defendant with sexual assault of a child and appointed him an attorney. *Id.* at 835. In accordance with state statute, the social worker shared the information she obtained from these interviews with the police. *Id.* The court found that because, "[a]s mandated by [state statute], she worked jointly, exchanging reports, with the police in investigating [the defendant]," the social worker had become a government agent in the defendant's prosecution. *Id.* at 836–37. The court found it troublesome that the social worker did not notify the defendant's attorney before the interviews, even though "[s]he knew that a prosecution had already been initiated and that the information she obtained would be shared with the police." *Id.* at 837.

In *People v. Wilhelm*, 34 A.D.3d 40, 822 N.Y.S.2d 786 (2006), the New York Supreme Court, Appellate Division, held that child protective services (CPS) investigators were agents of the state for Sixth Amendment purposes, and admitting statements they obtained from the defendant violated her right to counsel. *Id.* at 792, 794. In that case, the CPS caseworkers interviewed the defendant in jail following her arraignment. *Id.* at 792. The court found the CPS caseworkers had a "cooperative working arrangement" with the police and prosecutor. *Id.* at 793. They were members of a "multidisciplinary team," composed of members of the prosecutor's office, police force, and social service agencies, who convened to discuss progress in child-abuse investigations. *Id.* at 791. The team regularly met, and, when requested, the CPS caseworkers provided information to the prosecutor's office. *Id.* at 791–92. The court stated that it was "immaterial that the CPS caseworkers considered their investigation separate from that of the police * * *; defendant's 'right to counsel cannot hinge on the government's characterization of its own investigation.'" *Id.* at 793.

counsel not be violated. We hasten to add that nothing in this opinion should be interpreted as prohibiting or restricting a child protective investigator or other official responsible for investigating allegations of abuse from interviewing an accused. The right to counsel is implicated, however, if the state chooses to use the information so obtained in its prosecution.

## 2. Harmless Error

■ Notwithstanding the finding of a constitutional violation, this Court will not vacate a criminal conviction if the error was harmless to a defendant. "The United States Supreme Court has defined 'harmless error' as an error that 'in the setting of a particular case [is] so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.'" *State v. Lopez,* 943 A.2d 1035, 1043 (R.I.2008) (quoting *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "[A]scertaining whether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction." *Id.* (citing *State v. Lachapelle,* 112 R.I. 105, 112–13, 308 A.2d 467, 471 (1973)). Erroneously admitted evidence "which possibly influenced the jury adversely to a litigant cannot * * * be conceived of as harmless." *Chapman,* 386 U.S. at 23–24, 87 S.Ct. 824. "[B]efore a federal constitutional error can be held

harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824.

■ An error is subject to harmless-error analysis if the error was merely a "trial error" that occurred during the course of the presentation of evidence to the jury and can "be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). "[M]ost constitutional errors can be harmless," and even the unconstitutional admission of an illegally obtained confession in violation of the Fifth and Sixth Amendments is subject to harmless-error analysis. *Fulminante,* 499 U.S. at 306, 310, 111 S.Ct. 1246; *State v. Feole,* 797 A.2d 1059, 1067 n. 7 (R.I. 2002). *See, e.g., Milton v. Wainwright,* 407 U.S. 371, 372, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (confession obtained in violation of Sixth Amendment held to be harmless beyond a reasonable doubt); *United States v. Coker,* 433 F.3d 39, 47, 49 (1st Cir.2005) (even if government violated the defendant's Sixth Amendment right to counsel by introducing a statement the defendant made at an interview without presence of an attorney, any error was harmless beyond a reasonable doubt in light of overwhelming evidence of the defendant's guilt).[18]

---

18. We have observed that, when reviewing constitutional errors in criminal trials, the United States Supreme Court has promulgated a bipartite analysis. *State v. Feole,* 797 A.2d 1059, 1067 n. 7 (R.I.2002). If an error constitutes a "structural defect"—a defect that "affect[s] the framework within which the trial proceeds"—that error never can be treated as harmless. *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In distinguishing trial errors subject to a harmless error analysis

from structural defects, the United States Supreme Court has included in the latter category the "total" or "complete" deprivation of the right to counsel at trial. *Id.* at 309, 111 S.Ct. 1246. The Court has treated the admission of statements obtained from the defendant pretrial without the presence of counsel in violation of the Sixth Amendment differently, subject to the harmlessness doctrine. *Compare Gideon v. Wainwright,* 372 U.S. 335, 343–44, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of Sixth Amendment right

■ Although an admission or confession is subject to harmless-error analysis, we have recognized:

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him * * *. * * * Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.'" *State v. Bettencourt,* 763 A.2d 636, 639 (R.I.2000) (quoting *Fulminante,* 499 U.S. at 296, 111 S.Ct. 1246).

Furthermore, this Court appreciates that "the application of the harmless error rule must be used guardedly lest it destroy or dilute constitutional guarantees." *Lachapelle,* 112 R.I. at 113, 308 A.2d at 471 (citing *Chapman,* 386 U.S. at 50, 87 S.Ct. 824 (Harlan, J., dissenting)).

In *Bettencourt,* 763 A.2d at 639, we held that the admission of an involuntary confession in a child-molestation prosecution was not harmless error, "despite the fact that the other evidence introduced at trial was sufficient to support defendant's conviction." In that case, the admission of the confession may have bolstered the credibility of the victim and her mother. *Id.* Thus, we could not find, beyond a reasonable doubt, that the admission of the defendant's confession did not affect the jury's evaluation of the evidence. *See also State v. Vargus,* 118 R.I. 113, 125, 373 A.2d 150, 156 (1977) (in which the defendant's admission "served to corroborate the circumstantial evidence adduced by the prosecution" and had a "persuasive impact on the ultimate fact to be determined at the

trial, defendant's guilt or innocence," error was not harmless); *Lachapelle,* 112 R.I. at 113, 308 A.2d at 471 (the defendant's incriminating statement, "with its corroborating impact on other evidence adduced through defendant himself, beyond a reasonable doubt contributed to the verdict of the jury" and could not be considered harmless).

■ Similarly, in the instant case, the improper admission of defendant's statements to Ms. Moriarty "may well have affected the jury's evaluation of the evidence." *Bettencourt,* 763 A.2d at 638. In this case, the prosecution had a strong case against defendant without admission of these statements: the testimony of Phillip, his mother, the arresting officer, and the examining physician, defendant's earlier statement to the police, and compelling DNA evidence. This evidence alone might have supported a guilty verdict. Nonetheless, Ms. Moriarty's testimony was particularly prejudicial. It was the only testimony offered that mentioned penile, as opposed to digital, penetration of the young boy. Moreover, her testimony that "he stated that he spread [Phillip's] hole with his fingers to loosen him up and then he put his penis inside the child and rammed him," was much more graphic and inflammatory than any other evidence offered. Indeed, it was so damaging and prejudicial that the prosecutor used it as the opening line of her closing argument. *See Satterwhite v. Texas,* 486 U.S. 249, 260, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (evidence admitted in violation of the Sixth Amendment held not to be harmless error where prosecution highlighted the erroneously admitted evidence

to counsel throughout entire proceeding can never be considered harmless error), *with Satterwhite v. Texas,* 486 U.S. 249, 257, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) ("[w]e have permitted harmless error analysis in

* * * cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial").

in closing argument to the jury). It is doubtful that this statement did not have a persuasive or corroborating impact on the determination of defendant's guilt or innocence.

After reviewing all the evidence with the required degree of caution, we are not convinced *beyond a reasonable doubt* that admission of defendant's statements to Ms. Moriarty did not contribute to the jury's evaluation of the evidence and defendant's conviction. Accordingly, we reverse the judgment of conviction and remand the case to the Superior Court for a new trial. Because our holding precludes the admission of defendant's statement to Ms. Moriarty at the ACI on Sixth Amendment grounds, we do not reach the Fifth Amendment issues raised in his appeal. We address defendant's hearsay argument, however, to provide guidance to the trial court because the same issue may arise at a new trial.

### B.

### Admissibility of Hearsay Statement

Mr. Oliveira also alleges as error the admission of Barbara's testimony recounting her son's remarks to her on the morning of August 12, 2004. He contends that Phillip's statements to his mother did not properly qualify as excited utterances and thus were inadmissible hearsay. The state counters that it was not clear error for the trial justice to admit these statements under the excited utterance exception.

At trial, Philip was able to testify about what had occurred in his bedroom the night of August 11, 2004, and morning of August 12, 2004. The young boy also told the jury that later that same morning he told his mother what had happened. The prosecution subsequently called Barbara to the witness stand; she repeated what Phil-

lip had told her that morning, though their respective recollections of what Phillip said and did were not entirely consistent.[19] Even though Phillip already had told the jury what defendant did to him, the trial justice allowed Barbara to testify, additionally, about what Phillip told her had happened with defendant.

 "It is well established that '[t]he admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous.'" *State v. Bergevine,* 942 A.2d 974, 978 (R.I. 2008) (quoting *State v. Ruffner,* 911 A.2d 680, 689 (R.I.2006)). *See State v. Torres,* 787 A.2d 1214, 1222 (R.I.2002) (admissibility of an excited utterance is clearly within the trial justice's discretion and will not be overturned unless there is an abuse of discretion).

 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." R.I. R. Evid. 801(c). Hearsay in not admissible except as provided by law. R.I. R. Evid. 802. Our rules of evidence provide for an excited-utterance exception to the inadmissibility of hearsay evidence. R.I. R. Evid. 803(2). A statement that otherwise is hearsay is admissible if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* The rationale behind the excited utterance exception is that "a startling event may produce an effect that temporarily stills the declarant's capacity of reflection and produces statements free of conscious fabrication." *Torres,* 787 A.2d at 1222 (quoting *State v.*

---

**19.** *See supra* footnote 2.

*Krakue,* 726 A.2d 458, 462 (R.I.1999)); *see* Advisory Committee's Note to Rule 803(2).

A statement need not have been "strictly contemporaneous with the startling event" for it to be admissible as an excited utterance. *State v. Momplaisir,* 815 A.2d 65, 70 (R.I.2003) (quoting *State v. Mendez,* 788 A.2d 1145, 1147 (R.I. 2002)). The test is whether, from a consideration of all the facts, the declarant "was still laboring under the stress of excitement caused by the event when he or she made the statement at issue." *State v. Morales,* 895 A.2d 114, 120 (R.I.2006) (citing *State v. Nordstrom,* 104 R.I. 471, 476, 244 A.2d 837, 840 (1968)).

This Court has noted that in cases of sexual assault the time requirement is less demanding, especially when the victim is a child of tender years. *Morales,* 895 A.2d at 120; *see, e.g., State v. Creighton,* 462 A.2d 980, 982 (R.I.1983) (upholding the admission of a statement by a child sexual-assault victim to a detective made roughly fourteen hours after the event); *State v. Souza,* 456 A.2d 775, 778 (R.I.1983) (trial justice did not abuse discretion in admitting statements of a child sexual-assault victim to his mother made six or seven hours after the incident); *Nordstrom,* 104 R.I. at 472–73, 477, 244 A.2d at 838–41 (acts related by the declarant probably occurred about twenty-four hours before the admitted statement). The time requirement is more lenient in sexual assault cases under the reasoning that "the shock of the event often lasts longer and the outpouring may come only later, when a parent, friend, or officer is present." *Morales,* 895 A.2d at 120.

Nevertheless, "[t]he state has the burden of proving that the statement is spontaneous and was made before the declarant had an opportunity to contrive or misrepresent." *State v. Burgess,* 465

A.2d 204, 207 (R.I.1983). "The guarantee of trustworthiness [for the excited utterance exception] is assured as long as the declarant made the statements as an 'instinctive outpouring' or an 'effusion.'" *Krakue,* 726 A.2d at 462 (quoting *State v. St. Jean,* 469 A.2d 736, 738 (R.I.1983)). *Compare State v. Oisamaiye,* 740 A.2d 338, 339 (R.I.1999) (statements by a nursing home patient made after he had calmed down from an earlier excitable experience were still given "in a state of nervous excitement"), *with Burgess,* 465 A.2d at 207 (statement declarant made to the fourth person who spoke with her after the incident not admissible as an excited utterance). Whether a statement was in response to an inquiry is a factor in determining spontaneity, but does not render the excited-utterance exception inapplicable. *St. Jean,* 469 A.2d at 738–39 (victim's statements made in response to police officer's questions at the scene of the crime less than five hours after the startling event admissible as excited utterances); *Creighton,* 462 A.2d at 982 (despite victim's initial denial of molestation during questioning, subsequent statements made during police questioning admissible because of victim's "very emotional" behavior). Evidence of the declarant's demeanor may be necessary to determine whether a statement was a "spontaneous verbal reaction." *See State v. Jalette,* 119 R.I. 614, 621–22, 382 A.2d 526, 530–31 (1978); *see also State v. Poulin,* 415 A.2d 1307, 1311 (R.I.1980) (prosecution's failure to introduce demeanor evidence prevented a finding of excited utterance).

Evidence was presented at defendant's trial that reasonably could support a conclusion that Phillip was "still laboring under the stress of the nervous excitement engendered by the event" when he spoke to his mother. *Morales,* 895 A.2d at 120 (citing *State v. Vaccaro,*

111 R.I. 59, 63, 298 A.2d 788, 790 (1973)). According to Phillip's testimony, his grandfather penetrated him that very same morning, only two or three hours before he spoke with his mother, satisfying the less demanding time requirement in cases of child sexual abuse. Phillip appeared to be in physical distress from the assault because he felt the need to go to the bathroom but "nothing came out" except water. His mother described his demeanor as "nervous," "scared," and "quiet and pulled back." Unlike the child's unprompted forthcoming in *Morales*, 895 A.2d at 117, here Phillip did not divulge the incidents to his mother until after she inquired into his unusual behavior. Nonetheless, a response to a question can still be a spontaneous verbal reaction. *See St. Jean*, 469 A.2d at 738; *Creighton*, 462 A.2d at 982. Considering Phillip's prior good relationship with his grandfather and his fear that his mother would be upset by his disclosure, it was not unreasonable for the trial justice to find that his responses were spontaneous reactions to her questions and made while still laboring under the stress of the event.

We recognize that had the trial justice excluded Phillip's statements to his mother, we more than likely would sustain the exercise of his discretion. We also are mindful of our holding that "[t]he use of such terms as 'tears,' 'nervous,' or 'upset' are not to be the 'open sesame' to having a declarant's statement classified as a spontaneous utterance." *St. Jean*, 469 A.2d at 739 (quoting *Jalette*, 119 R.I. at 621, 382 A.2d at 530). Nevertheless, the admissibility of evidence as an exception to the rule against hearsay is a decision entrusted in the first instance to the "sound discretion of the trial justice." *Id.* (quoting *Creighton*, 462 A.2d at 982). In this case, we are satisfied that the trial justice did not abuse his discretion by allowing Phillip's statements to his mother into evidence as excited utterances.

## C.

### Right to a Speedy Trial

Lastly, defendant submits that, although the trial justice properly treated the arguments he advanced in a *pro se* motion on the day before the trial commenced as a motion to dismiss for lack of a speedy trial, the trial justice erred in denying the motion. Mr. Oliveira argues that the twenty-five-month delay, between the filing of charges and the start of trial, warrants dismissal of the indictment. The state maintains, on the other hand, that the record does not support defendant's allegation about the lack of a speedy trial.

Toward the conclusion of pretrial hearings on September 14, 2006, defense counsel informed the trial justice that his client wished to bring several matters to the court's attention, including a *pro se* motion for removal of counsel. When given the opportunity to address the court, Mr. Oliveira acknowledged that his attorney "seem[ed] to be doing a fair job," and that his "quarrel was more of a speedy trial kind of thing." The trial justice denied the motion for a speedy trial, reasoning, first, that there had been no speedy-trial request and, second, that the delays were caused by both attorneys' calendars and respective workloads, as well as by the routine operation of the court system.

The record in this case reveals that after a pretrial conference on February 17, 2005, the case was continued "pending further investigation" on at least nine occasions, and the prosecutor and defense counsel each was unavailable four times. The case was "passed for trial" at the pretrial conference on October 12, 2005, and added to the "ready trial" calendar on March 28, April 4, and May 16, 2006. Al-

though the state filed a motion for a continuance on January 6, 2006, on grounds that "the State [was] awaiting reciprocal discovery," the state did not obtain a search warrant for a buccal swab of Mr. Oliveira for purposes of DNA analysis until May 12, 2006, nor did it submit the sample for DNA analysis to the Rhode Island Department of Health until May 22, 2006. The court finally assigned a date certain of September 12, 2006. Trial by jury commenced on September 15, 2006.

 As a general matter, this Court reviews *de novo* a contention that a criminal defendant's constitutional right to a speedy trial has been violated. *State v. Bido*, 941 A.2d 822, 828 (R.I.2008) (citing *State v. Perez*, 882 A.2d 574, 590–91 (R.I. 2005)). Both the federal and state constitutions guarantee the right to a speedy trial for criminal defendants. U.S. Const. Amend. VI; R.I. Const. art. 1, sec. 10. In assessing whether a criminal defendant's right to a speedy trial has been violated, this Court adheres to the four-part test set forth by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *State v. Bleau*, 668 A.2d 642, 644–45 (R.I.1995); *Tate v. Howard*, 110 R.I. 641, 647–48, 296 A.2d 19, 23–24 (1972). The *Barker* Court set forth a balancing test, with four factors for consideration: (1) the length of time before trial, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. 2182. The determination of whether a constitutional violation has occurred "requires the weighing of each factor, with no single one being wholly dispositive." *State v. DeAngelis*, 658 A.2d 7, 11 (R.I.1995). However, "[a] delay in excess of twelve months is 'presumptively prejudicial,' triggering an analysis of the remaining three factors." *State v. Corbin*, 805 A.2d 702, 702 (R.I.2001)

(mem.) (quoting *State v. Powers*, 643 A.2d 827, 831 (R.I.1994)). In the instant case, the length of the delay between the filing of charges and the commencement of trial was twenty-five months and therefore was presumptively prejudicial, triggering the full *Barker* analysis.

 Under the second *Barker* factor, this Court must consider the reason for the delay. Naturally, intentional attempts to delay trial to gain a tactical advantage over a defendant weigh heavily against the prosecution. *Barker*, 407 U.S. at 531, 92 S.Ct. 2182. Moreover, because it is the ultimate responsibility of the state to insure that criminal defendants are speedily brought to trial, the state likewise carries the responsibility for justifying negligent delays. *Doggett v. United States*, 505 U.S. 647, 652–53, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *State v. Wheaton*, 528 A.2d 1109, 1112 (R.I.1987). Similarly, delay caused by congested court facilities, backlogged cases or prosecutorial scheduling conflicts may be attributed to the state, although such a delay is not as egregious as other reasons for delay. *See Wheaton*, 528 A.2d at 1112 (even where "overwhelming bulk of the delay was caused by the criminal-court-calendar system * * * the ultimate responsibility for such delay must nevertheless be borne by the government"); *see also Powers*, 643 A.2d at 831 (same); *State v. Anthony*, 448 A.2d 744, 749–50 (R.I.1982) (same).

 On the other hand, a defendant cannot take advantage of a delay for which he or she is responsible, whether caused by action or inaction on his or her part, and that factor will weigh against him or her in the balance. *Perez*, 882 A.2d at 591–92 (the defendant bore responsibility for the delay because it was attributable to the preparation of his own defense); *State v. Crocker*, 767 A.2d 88, 93 (R.I.2001) (right to a speedy trial was not violated

when the defendant avoided returning to the jurisdiction); *State v. Austin,* 742 A.2d 1187, 1194 (R.I.1999) (the defendant caused delay by seeking to remove five different court-appointed attorneys); *State v. Van Daam,* 711 A.2d 654, 656 (R.I.1998) (mem.) (on twelve separate occasions, trial delayed by the defendant's own deliberate, dilatory actions, including willfully refusing to meet his court-appointment obligations). Moreover, the defendant bears responsibility for defense counsel's scheduling conflicts and requests for continuances when the defendant never moves to substitute counsel or dismiss the indictment prior to trial, and each continuance is granted in accordance with the legitimate needs of competent counsel. 21A Am.Jur.2d *Criminal Law* § 960 (2008) (citing *United States v. Tanh Huu Lam,* 251 F.3d 852, 857–58 (9th Cir.2001)).

In the instant case, the prosecution's four scheduling conflicts, along with delays caused by the court calendar, weigh against the state. Furthermore, it appears that the state prolonged a rather uncomplicated investigation in this case. Although the case was frequently continued for further investigation, the trial record indicates that all evidence presented at trial, other than the taking of defendant's DNA sample, was gathered in the first month of the investigation. It is unclear why the state waited twenty-one months after defendant's arrest to obtain a search warrant for defendant's DNA. On the other hand, the record reveals that the case was continued on four occasions due to defense counsel's unavailability. Although Mr. Oliveira thrice moved for dismissal of his attorney, it does not appear that any such motion was pressed. In light of these factors, we conclude that, on balance, the second *Barker* factor weighs against the state.

The third *Barker* factor to consider is whether defendant asserted his right to a speedy trial. "[W]hen assessing a defendant's assertion of his right to a speedy trial, this Court looks for actions sufficiently aggressive to constitute the equivalent of a 'banging on the courthouse doors.'" *Perez,* 882 A.2d at 592 (quoting *Bleau,* 668 A.2d at 645 and *Tate,* 110 R.I. at 656, 296 A.2d at 27). *Compare State v. Hernandez,* 641 A.2d 62, 68 (R.I.1994) (a defendant who moved for a speedy trial one month after a criminal information, but not again until almost twenty-two months later, "could have been more aggressive in asserting her right") *and Anthony,* 448 A.2d at 750 (the defendant's failure to assert his right to a speedy trial for two years following his indictment "hardly demonstrates an active pursuit of this right"), *with Wheaton,* 528 A.2d at 1112 (right to a speedy trial violated when the defendant filed four demands for a speedy trial and notified the state when no trial had occurred).

In this case, defendant did not explicitly demand a speedy trial before raising the subject at the pretrial-motion hearing on the day before the jury was impaneled. Even if we were to assume that the reasons for defendant's motions to dismiss counsel were predicated on denial of a speedy trial, these motions cannot be said to constitute an assertive "banging on the courthouse doors." *Tate,* 110 R.I. at 656, 296 A.2d at 27. Although defendant alluded to what he considered unnecessary delay of trial, he never specifically moved to dismiss for lack of a speedy trial. Like the defendant in *Anthony,* who waited two years to assert his right to a speedy trial, Mr. Oliveira's failure to assert explicitly his right to a speedy trial until two years after his indictment weighs heavily against him in consideration of the third *Barker* factor.

The fourth and final *Barker* factor instructs the court to examine whether the delay caused prejudice to the defendant. The United States Supreme Court identified three types of prejudice that the right to a speedy trial was designed to prevent: oppressive pretrial incarceration, anxiety and concern of the defendant, and impairment of the ability to present a defense. *DeAngelis,* 658 A.2d at 12 (citing *Barker,* 407 U.S. at 532, 92 S.Ct. 2182). The latter concern is the most important "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (quoting *Barker,* 407 U.S. at 532, 92 S.Ct. 2182). This Court has recognized that affirmative proof of prejudice is not essential to every speedy-trial claim because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* (citing *Doggett,* 505 U.S. at 655, 112 S.Ct. 2686).

Here, defendant concedes, in his brief, "Mr. Oliveira's ability to mount a defense was not, to his knowledge, compromised with the passage of time." As such, the delay in this case did not obstruct the most important protection of the right to a speedy trial, impairment of the ability to present a defense. Additionally, defendant failed to allege any anxiety or emotional strain because of the delay. Lastly, although defendant remained incarcerated between his arrest and trial, we previously have held that " 'to the extent that incarceration disrupts one's freedom, employment, and familial associations, * * * this

disruption merely constitutes a prejudice inherent in being held while awaiting trial' and is insufficient alone to satisfy the fourth and final *Barker* factor." *Perez,* 882 A.2d at 592 (quoting *State v. Austin,* 643 A.2d 798, 801 (R.I.1994)); *State v. Verrecchia,* 766 A.2d 377, 385 (R.I.2001). For instance, in *Perez,* 882 A.2d at 592, we held that the defendant did not sufficiently demonstrate prejudice even though he was held without bail while awaiting trial.[20] In that case, as in the instant case, at least two years passed between the defendant's arrest and the date of trial. *Id.* at 591–92. Although defendant need not specifically demonstrate how the delay of trial caused prejudice to him, the relevant facts in this case do not establish any prejudice beyond the disruption caused by his incarceration.

In balancing the above factors, it is our opinion that the defendant was not denied his right to a speedy trial.

### III

### Conclusion

For the reasons stated in this opinion, we vacate the judgment of conviction and remand the case to the Superior Court for a new trial.

---

**20.** In *State v. Perez,* 882 A.2d 574, 592–93 (R.I.2005), though the defendant initially was held without bail, one year after being incarcerated, a Superior Court hearing justice granted defense counsel's motion for admission to bail and set bail at $300,000 with surety.