|  |  |
|---|---|
| State | : |
| v. | : |
| Reynaldo Gomez. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                                 :

Reynaldo Gomez.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, Reynaldo Gomez, appeals from a Superior Court judgment of conviction after having been found guilty by a jury of second-degree sexual assault in violation of G.L. 1956 § 11-37-4(2).[1]  On appeal, the defendant contends that the trial justice erred in: (1) denying his motion for judgment of acquittal;[2] (2) denying his motion for a new trial; and (3) allowing the complaining witness's statements to the police

---

[1] General Laws 1956 § 11-37-4, as it was styled at the time pertinent to this case, provided as follows:

> "A person is guilty of a second degree sexual assault if he or she engages in sexual contact with another person and if any of the following circumstances exist:
> "(1) The accused knows or has reason to know that the victim is mentally incapacitated, mentally disabled or physically helpless;
> "(2) The accused uses force or coercion;
> "(3) The accused engages in the medical treatment or examination of the victim for the purpose of sexual arousal, gratification or stimulation."

This version of the statute provides the language applicable to the present case.  However, the General Assembly in 2014 amended the "force or coercion" element of the statute.  The amended version of § 11-37-4(2) reads: "The accused uses force, element of surprise, or coercion."  P.L. 2014, ch. 164, § 1.

[2] We note that defendant does not explicitly frame this argument set forth in his prebriefing statement as an appeal from the denial of his motion for judgment of acquittal.  In defendant's supplemental briefing memorandum submitted to this Court, however, he does express his insufficiency argument, along with an argument for the preservation thereof, in the context of his motion for judgment of acquittal.  We treat it as such.

- 1 -

officer at the scene into evidence under the excited-utterance exception to the hearsay rule. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

The incident giving rise to defendant's conviction occurred in the early evening of September 13, 2011 in Smithfield, Rhode Island at the Blackbird Farm Stand. Following this incident, defendant was charged by a criminal information, filed in Superior Court on November 29, 2011, with one count of second-degree sexual assault pursuant to § 11-37-4. A jury trial in Superior Court took place over five days in July 2013. The following facts chronicling the unfortunate events that unfolded at the Blackbird Farm Stand came to light at trial. The Blackbird Farm Stand is a small stand or, as it was described at trial, approximately "twice the size of the top of the [trial court] clerk's desk," with only three windows and one door. The stand offers customers a selection of goods, such as meat, produce, vegetables, cheese, and milk. Inside the farm stand, in addition to the goods, there was a refrigerator and a counter with a single stool behind it.

On September 13, 2011, Jessica[3] was the cashier at the Blackbird Farm Stand perched behind the counter on that lone stool. She was the sole employee working at the farm stand that

---

[3] We use a pseudonym to identify the complaining witness.

day; however, she testified that the farm owner or the owner's son would typically check on her approximately every two hours. She was eighteen years old at the time, working part-time at the farm stand as a cashier. Jessica had been on the job for about a month.

She testified that a male customer, defendant, walked into the farm stand at about 5:30 that evening. Jessica, however, explained that she did not notice him immediately because she had her back to the door while she restocked the refrigerator. In her testimony, Jessica stated that, when she turned around to get additional produce, it was the first time she noticed the customer behind her. At trial, she described him as being "about a foot or two" away from her. Further, she testified, "he didn't say a word, he didn't even say anything, which kind of spooked me I guess. * * * [N]ormally customers would say something like 'Hi' or 'How are you?'" Jessica explained that she turned around and said: "Hi. Can I help you with anything?" She testified that in response defendant did not answer her question, but rather he asked her if she spoke Spanish. Next, defendant inquired about where the food products, such as the corn, came from.

After this exchange, defendant stepped outside the farm stand. Jessica testified that when defendant went outside, "I felt weird, I just didn't feel right." She explained that "I had a bad feeling -- in my stomach, I just -- I don't particularly like to be alone at that time." She indicated in response to the state's question at trial that she felt nervous at that time. Jessica also testified that a female customer entered the Blackbird Farm Stand and purchased some items during this time. Jessica did have a cell phone with her that day. She explained at trial, however, that because her prepaid phone was out of minutes she could use it only to text. After the female customer departed, defendant came back into the farm stand. The defendant asked Jessica, "[d]o you have a husband or a boyfriend?" Jessica testified that she said "no," which was a response

that "just came out." To that response defendant replied: "[y]ou're very beautiful and I like you. I have a crush on you." Jessica replied with a "thanks," which she described at trial as being uttered in a "very sarcastic, kind of angry, mean way." Jessica detailed that these comments "made me feel worse than I did when he went in there. I felt like just -- I just had a bad feeling." She indicated that she felt uncomfortable, nervous, and scared. In her testimony, she elaborated that, "I was just afraid that anything could happen. * * * I was just afraid that he would ask me more odd questions and he would come behind the counter or even just lock the door, I don't -- I don't know."

At that time, the counter stood between defendant, who was standing in front of it, and Jessica, who was sitting behind it. The defendant appeared to want to purchase some corn. Jessica testified: "I was trying to just hurry up, I wanted to go home, it was six o'clock, so I was just -- I was like '[a]re you looking for anything else?'" She stated that defendant perused the bread stand, located at the right corner of the counter, selecting a package of bread to add to his items for checkout. Jessica described that, while ringing up defendant's order, defendant moved to the side of the counter. After cashing out the corn, Jessica testified that she "s[aw] him closer." She explained that "I cashed out the bread, and before I know it, he's like not even a foot away from me." At trial, she expressed that a customer at the farm stand had never before come that close to her. Jessica testified that, while she continued to total the cost of his order, defendant "put[] his hand on [her] inner thigh." She was wearing a pair of shorts and was seated atop the stool behind the counter. Jessica explained at trial that, in response, she "said '[n]o' and I pushed [his hand] away." She testified further that she "felt like I was going to throw up," was "scared," and "wanted to cry." She also indicated that she noticed defendant was "aroused" at that time.

There was no one else around at the farm stand. Jessica testified that defendant then touched her again when he "swept [her] vagina over her shorts." She stated that she then got the price of his order, which she told him three times, and then she "told him that I was [fourteen] as a defense to make him somewhat scared that, you know, maybe I'm a minor, maybe you shouldn't do that, but that was a defense." According to Jessica, defendant responded "[o]kay, okay, I'm sorry, you're very beautiful." She explained that defendant paid in cash and "left in a hurry" because he must have seen another customer arrive. Jessica detailed that next she went to the window and grabbed a marker to write down defendant's license plate on her hand. When questioned about how she felt at that time, she indicated that she felt "shocked" and also "felt relieved at the same time because he left." She also indicated that she was upset, crying, and shaking.

A second witness, Michael Lamoureux, testified that he decided to deviate from his usual work-to-home routine that day with a stop at the Blackbird Farm Stand. This was Mr. Lamoureux's first visit to the farm stand. He had driven past the Blackbird Farm Stand twice a day for years, but he finally decided to stop and support the local farmer. In his testimony at trial, Mr. Lamoureux described that, when he pulled into the parking lot, he noticed a red Pontiac parked right in front of the farm stand. Mr. Lamoureux was the next customer to enter the farm stand after defendant's hasty departure. Jessica explained that she had never met Mr. Lamoureux previously, but after he asked her if she was all right, she explained what had happened. She told him that she had just been assaulted. Mr. Lamoureux testified that "[Jessica] seemed very upset, she was visibly shaken and physically shaking when I entered the building."

Mr. Lamoureux explained that he immediately went outside and got a description of the car and license plate, as well as a "cursory description" of the driver of the vehicle. At the time

- 5 -

of trial, Mr. Lamoureux stated that he was employed as a sales executive at a computer company, but that he had the background and training of a military police officer. Mr. Lamoureux explained that he utilized his military training in taking quick action to secure these descriptions and dial 9-1-1. The police arrived at the Blackbird Farm Stand approximately ten minutes later.

Jessica spoke briefly with Officer Michael Proulx of the Smithfield Police Department inside the farm stand. Officer Proulx testified at trial that Jessica's demeanor at that time was "[u]pset, trembling, tearful." When Officer Proulx questioned Jessica at the scene, she told him that she had just been assaulted. Defense counsel lodged an objection at this response, which was initially sustained. However, the trial justice entertained brief discussion at sidebar and then overruled that objection after determining that Jessica's response qualified as an excited utterance. Officer Proulx next inquired of Jessica as to who had perpetrated the assault. In response, Officer Proulx testified that Jessica provided him with defendant's license plate number that she had written on her hand. Officer Proulx explained that he immediately went back to his cruiser and ran the license plate number. Officer Proulx also recounted Jessica's description of the vehicle as "an older model red Pontiac." Subsequently, Officer Proulx drove Jessica to the police station where she proffered and he transcribed an official statement regarding the incident. The next day Jessica returned to the police station in order to view a photo array. She identified and selected defendant from the six photos presented.

At the conclusion of the state's presentation of evidence, defendant made a motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure.[4]

---

[4] Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure states, in pertinent part:
> "The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, after the

In arguing that motion, defendant asserted that there was insufficient evidence of intent for sexual gratification. The defendant argued that the alleged touching could be "construed in every way as an accidental sweeping." The trial justice found sufficient evidence of intent for sexual gratification and therefore denied defendant's motion for judgment of acquittal. The defendant then rested.

The jury returned a verdict of guilty on one count of second-degree sexual assault. The defendant subsequently filed a motion for a new trial, and a hearing was held on the motion on November 8, 2013. The trial justice denied defendant's motion for a new trial. The defendant was sentenced to ten years, with one year to serve and nine years suspended with probation, as conditions of which he was to cooperate with sex-offender counseling and register as a sex-offender. The judgment of conviction was entered on February 25, 2014. The defendant filed a timely notice of appeal.

## II

### Discussion

The defendant raises three issues on appeal. First, defendant argues that the trial justice erred in denying his motion for a new trial by overlooking and misconceiving material evidence. Second, defendant contends that the state failed to prove the element of "force or coercion" necessary to sustain a conviction for second-degree sexual assault. Third, defendant asserts that the trial justice erred in admitting Jessica's statements—made to Officer Proulx at the farm stand—into evidence at trial under the excited-utterance exception to the hearsay rule. We address each issue in turn, providing additional facts as necessary.

---

evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

# A

## Motion for a New Trial

The defendant avers that the trial justice "overlooked and misapprehended critical evidence" in concluding that Jessica was a "credible witness whose testimony deserves much weight." The state, for its part, argues that there was no error in the trial justice's denial of defendant's motion for a new trial.

### 1. Standard of Review

"We have oft stated that, '[w]hen faced, as here, with both Rule 29 and [Super. R. Crim. P.] 33 motions, this Court first conducts a review of the new-trial motion.'" State v. Storey, 102 A.3d 641, 646 (R.I. 2014) (quoting State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014)). We employ this approach in our review because a defendant has a "higher hurdle to overcome when arguing a Rule 29 motion for judgment of acquittal than when he seeks to prevail on a Rule 33 motion for a new trial * * *." Id. (quoting Fleck, 81 A.3d at 1133). "[U]nless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal." Id. (quoting State v. Pineda, 13 A.3d 623, 640 (R.I. 2011)).

"When a trial justice is presented with a motion for a new trial based on the weight of the evidence, he or she 'acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" Storey, 102 A.3d at 646 (quoting State v. Watkins, 92 A.3d 172, 191 (R.I. 2014)). "[T]he trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Watkins, 92 A.3d at 191). "If, after

- 8 -

conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Watkins, 92 A.3d at 191). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. (quoting Watkins, 92 A.3d at 191).

"This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an 'especially good position to evaluate the facts and to judge the credibility of the witnesses * * *.'" Storey, 102 A.3d at 647 (quoting Watkins, 92 A.3d at 191). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Watkins, 92 A.3d at 191).

## 2. Analysis

After a review of the record, it is clear to this Court that defendant's arguments on appeal evince little more than a disagreement with the trial justice's determination on the credibility of the complaining witness, Jessica. The trial justice found that "[t]he evidence in light of the jury charge was strong and consistent with this verdict." With regard to Jessica, she found her to be "a credible witness whose testimony deserves much weight." The trial justice also specifically rejected the contention that Jessica had an ulterior, pecuniary motive in this case. The trial justice explained that, "[a]lthough the defense attempted to portray her as a money-hungry victim trying to leverage a personal injury action, she did not in any way appear to be that person to the [c]ourt. She appeared honest and forthright." The trial justice also observed: "[t]he fact that she said nothing to the woman who appeared in the store does not faze this [c]ourt, nor does the fact that she didn't text anyone from her broken cell phone faze the [c]ourt. She was credible."

- 9 -

The defendant attempts to challenge this credibility determination made at trial on the basis of inconsistencies in Jessica's accounts of the incident. In particular, defendant highlights the fact that Mr. Lamoureux told the police in his official statement that, upon arriving at the Blackbird Farm Stand, Jessica told him that defendant had "grabbed her leg around the counter and she told him to leave immediately." The defendant makes the point that Jessica in her own testimony made no mention of asking defendant to leave after he touched her. Further, defendant maintains that Jessica made no mention of any "'sweeping' of her vagina" to Mr. Lamoureux or Officer Proulx. Finally, defendant contends that Jessica added additional elements of resistance in each of her subsequent accounts of the incident, which she did not describe in her testimony at trial.

This Court in State v. Jimenez observed that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Jimenez, 33 A.3d 724, 738 (R.I. 2011) (quoting State v. Rivera, 987 A.2d 887, 903 (R.I. 2010)). We afford great deference to the trial justice's determinations on a witness's credibility because the trial justice has "had the opportunity to observe the witnesses testify 'and therefore is in a better position [than this Court] to weigh the evidence and to pass upon the credibility of the witnesses * * *.'" Id. (quoting State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011)). Moreover, "if the trial justice has stated sufficient grounds for denying a motion for a new trial, we will not overturn that decision unless the trial justice 'has overlooked or misconceived material evidence or was otherwise clearly wrong.'" State v. LaPierre, 57 A.3d 305, 311 (R.I. 2012) (quoting State v. Bunnell, 47 A.3d 220, 233 (R.I. 2012)).

Here, the trial justice articulated adequate grounds to support her decision. The trial justice also determined that in addition to Jessica, Mr. Lamoureux and Officer Proulx were also

both highly credible witnesses. She explained that: "[a]ll of the evidence was extremely credible and worthy of belief. This Court would not have reached a different decision from that of the jury." Ultimately, in rendering her decision to deny the motion for a new trial, the trial justice said: "[T]his Court finds that the jury's verdict was consistent with the evidence and the instructions given to the jury, the jury charge with respect to the charge of second-degree sexual assault. The facts as testified to clearly demonstrated that a sexual assault did take place on this day." Accordingly, we are satisfied that the trial justice articulated adequate grounds for her decision to deny the motion for a new trial and did not overlook or misconceive material evidence in rendering her decision.

## B

### Motion for Judgment of Acquittal

On appeal, defendant argues that it is clear from the record that the state failed to prove the element of "force or coercion" necessary to sustain a conviction for second-degree sexual assault under § 11-37-4(2). The state contends that defendant has waived this argument because he did not raise it below and therefore did not preserve it for review by this Court. In particular, the state avers that defendant failed to make the argument that the element of "force or coercion" was not met in either his motion for judgment of acquittal or his motion for a new trial. With regard to the motion for judgment of acquittal, the state asserts that defendant confined his argument at that time to the issue of intent for sexual gratification.[5] With regard to the motion for a new trial, the state emphasizes that defendant attacked Jessica's credibility rather than the evidence present in the record to prove "force or coercion." Finally, the state asserts that, even if

---

[5] The trial justice asked for clarification from defense counsel as to whether the only issue being argued on the Rule 29 motion was lack of intent for sexual gratification. Defense counsel confirmed that that was correct.

the issue was preserved, there was sufficient evidence of Jessica's resistance for this Court to affirm defendant's conviction.

## 1. Standard of Review

"In reviewing the denial of a motion for a judgment of acquittal, 'we apply the same standard as that applied by the trial justice; namely, we must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" State v. Rolon, 45 A.3d 518, 523 (R.I. 2012) (quoting State v. Caba, 887 A.2d 370, 372 (R.I. 2005)). "If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied." State v. Snow, 670 A.2d 239, 243 (R.I. 1996).

## 2. Analysis

After conducting a careful review of the record, and particularly defendant's arguments made before the trial justice, we have serious doubts as to whether defendant preserved his insufficient evidence of "force or coercion" argument for our review. Nevertheless, we determine that, even if this argument had been properly raised, sufficient evidence of "force" exists to sustain defendant's conviction for second-degree sexual assault.[6] The defendant was found guilty of second-degree sexual assault in violation of § 11-37-4(2), which, at the time, stated in pertinent part: "A person is guilty of a second degree sexual assault if he or she engages in sexual contact with another person and if any of the following circumstances exist: * * * (2)

---

[6] With respect to defendant's Rule 29 motion, the record reveals that defendant raised only the issue of insufficient evidence of intent for sexual gratification below. Now, on appeal, defendant raises only the issue of insufficient evidence of "force or coercion" to sustain his conviction.

The accused uses force or coercion." "Force or coercion" is defined in § 11-37-1(2) as when the accused does any of the following:

> "(i) Uses or threatens to use a weapon, or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.
> "(ii) <u>Overcomes the victim through the application of physical force or physical violence</u>.
> "(iii) Coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes that the accused has the present ability to execute these threats.
> "(iv) Coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the accused has the ability to execute this threat." (Emphasis added.)

The definition applicable to the facts of the present case is set forth in § 11-37-1(2)(ii), which focuses on physical force. This Court has stated that, in order to sustain a conviction for second-degree sexual assault, the state "must prove force beyond that necessary to commit the sexual assault." <u>State v. Goodreau</u>, 560 A.2d 318, 322 (R.I. 1989); <u>see</u> <u>State v. Jacques</u>, 536 A.2d 535, 537 (R.I. 1988). In order to meet that standard, the state must demonstrate that the victim did not consent to the act. <u>Goodreau</u>, 560 A.2d at 322. Therefore, if the state introduces evidence of the victim's resistance to the act, then the defendant has used force beyond that necessary to commit the sexual assault. <u>Id.</u> We have recognized that the victim need only "offer such resistance as seems reasonable under all the circumstances." <u>Id.</u> at 322-23 (quoting <u>State v. Carvalho</u>, 122 R.I. 461, 467, 409 A.2d 132, 136 (1979)).

We find that the evidence of Jessica's resistance, which consisted of her telling defendant "no" and pushing his hand away, after he first touched her leg, and telling defendant she was fourteen was reasonable under the circumstances. Her verbal and physical reactions demonstrate her lack of consent to these offensive touchings by defendant. As such, we are of the opinion

- 13 -

that there was sufficient evidence of "force" within the meaning of § 11-37-1(2)(ii) to warrant submitting the second-degree sexual assault charge to the jury. Accordingly, we affirm the trial justice's denial of defendant's motion for judgment of acquittal.

## C

### Excited Utterance

The final argument that defendant advances on appeal is his contention that the trial justice abused her discretion in finding that all of Jessica's hearsay statements made to Officer Proulx at the farm stand were nevertheless admissible as excited utterances. The state argues that there was no error in the admission of Jessica's statements to Officer Proulx at the scene.

### 1. Standard of Review

Hearsay is defined in Rule 801(c) of the Rhode Island Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 of the Rhode Island Rules of Evidence sets forth the general prohibition against the admissibility of hearsay statements other than those well-recognized exceptions carved out by law. "[A] determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." Watkins, 92 A.3d at 187 (quoting State v. Martin, 68 A.3d 467, 475 (R.I. 2013)). Under this standard, this Court will uphold the trial justice's ruling unless a clear "abuse of discretion that prejudices the complaining party is shown." Id. (quoting Martin, 68 A.3d at 475).

### 2. Analysis

Among the well-recognized exceptions to the hearsay rule is the exception for excited utterances. State v. Torres, 787 A.2d 1214, 1222 (R.I. 2002). Rule 803(2) of the Rhode Island Rules of Evidence defines an excited utterance as "[a] statement relating to a startling event or

condition made while the declarant was under the stress of excitement caused by the event or condition." The rationale behind the excited-utterance exception is deeply rooted in the belief that "a startling event may produce an effect that temporarily stills the declarant's capacity of reflection and produces statements free of conscious fabrication." Martin, 68 A.3d at 475 (quoting State v. Oliveira, 961 A.2d 299, 314 (R.I. 2008)). Therefore, this Court has established that a particular guarantee of trustworthiness accompanies the declarant's statement so long as it is an "instinctive outpouring" or an "effusion." Torres, 787 A.2d at 1222 (quoting State v. Krakue, 726 A.2d 458, 462 (R.I. 1999)). In accordance with this rationale, "[t]he test is whether, from a consideration of all the facts, the declarant was still laboring under the stress of excitement caused by the event when he or she made the statement at issue." Martin, 68 A.3d at 475 (quoting Oliveira, 961 A.2d at 315).

The statement at issue need not be "strictly contemporaneous with the startling event" in order to qualify as an excited utterance. Martin, 68 A.3d at 475 (quoting Oliveira, 961 A.2d at 315). Furthermore, this Court has recognized that "[t]he time requirement is more lenient in sexual assault cases * * *." Id. (quoting Oliveira, 961 A.2d at 315). The modest relaxation of this timing requirement is based upon the understanding that, in sexual assault cases, "the shock of the event often lasts longer and the outpouring may come only later, when a parent, friend, or officer is present." Id. at 475-76 (quoting Oliveira, 961 A.2d at 315). Nevertheless, it is the state that bears "the burden of proving that the statement is spontaneous and was made before the declarant had an opportunity to contrive or misrepresent." Oliveira, 961 A.2d at 315 (quoting State v. Burgess, 465 A.2d 204, 207 (R.I. 1983)).

Here, evidence was presented at trial that reasonably supports a conclusion that Jessica was "still laboring under the stress of the nervous excitement engendered by the event" when she

- 15 -

spoke to Officer Proulx. Oliveira, 961 A.2d at 315 (quoting State v. Morales, 895 A.2d 114, 120 (R.I. 2006)). At trial, Jessica testified that defendant touched her "inner thigh" and "swept [her] vagina," which actions occurred shortly before she spoke with Officer Proulx. The record establishes that the statements in question were made to Officer Proulx after he arrived at the Blackbird Farm Stand about ten minutes after the incident occurred. In our opinion, ten minutes is not a significant lapse of time under the circumstances. Notably, according to testimony at trial, Jessica appeared to be in physical distress following the incident. Mr. Lamoureux testified that when he arrived at the farm stand "[Jessica] seemed very upset, she was visibly shaken and physically shaking when I entered the building." He also described her demeanor as "crying and shaking" while he called the police and waited for them to arrive. Officer Proulx described meeting Jessica in a similar "[u]pset, trembling, [and] tearful" state when he arrived at the Blackbird Farm Stand. The statements made by Jessica to Officer Proulx were not unprompted; rather her statements came in response to inquiries from Officer Proulx. Their exchange consisted of a series of questions, which prompted Jessica to: (1) tell Officer Proulx that "[s]he was just assaulted;" (2) explain by whom by providing the license plate number recorded on her hand; and (3) describe the vehicle she saw exiting the Blackbird Farm Stand.

The fact that Jessica's statements came in response to Officer Proulx's questions is not dispositive as to whether the excited-utterance exception is applicable here. See Oliveira, 961 A.2d at 315; State v. St. Jean, 469 A.2d 736, 737-38 (R.I. 1983) (affirming the admissibility of victim's statements made in response to police officer's questioning at the scene less than five hours after the startling event under the excited-utterance exception); see also State v. Creighton, 462 A.2d 980, 982 (R.I. 1983). This Court, however, does consider "[w]hether a statement was in response to an inquiry [as] a factor in determining spontaneity." Oliveira, 961 A.2d at 315.

We have held previously that "a response to a question can still be a spontaneous verbal reaction." Id. at 316; see St. Jean, 469 A.2d at 738; Creighton, 462 A.2d at 982-83. Given that Officer Proulx, in observing Jessica, described that "[y]ou could physically see the tears and you could see her trembling" just before he spoke with her, it was not unreasonable for the trial justice to find that her responses were spontaneous and made while still laboring under the stress of the event. See Oliveira, 961 A.2d at 316.

In light of our holding, we take this occasion to reiterate our observation from Oliveira in that "[t]he use of such terms as 'tears,' 'nervous,' or 'upset' are not to be the 'open sesame' to having a declarant's statement classified as a spontaneous utterance." Oliveira, 961 A.2d at 316 (quoting St. Jean, 469 A.2d at 739). We nevertheless recognize that the admissibility of evidence under the excited-utterance exception is a determination committed to the "sound discretion of the trial justice." Id. at 314. In the present case, we are satisfied that the trial justice did not abuse her discretion in admitting Jessica's statements made to Officer Proulx under the excited-utterance exception to the hearsay rule.

## IV

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The record of this case shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

TITLE OF CASE:  State v. Reynaldo Gomez.

CASE NO:  No. 2014-146-C.A.
(P2/11-3244A)

COURT:  Supreme Court

DATE OPINION FILED:  June 5, 2015

JUSTICES:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

WRITTEN BY:  Chief Justice Paul A. Suttell

SOURCE OF APPEAL:  Providence County Superior Court

JUDGE FROM LOWER COURT:

Associate Justice Sarah Taft-Carter

ATTORNEYS ON APPEAL:

For State:  Jane M. McSoley
Department of Attorney General

For Defendant:  Catherine Gibran
Office of the Public Defender