January 9, 2020

**Supreme Court**

No. 2018-42-C.A.
(P1/12-1584A)

State               :

v.               :

Matthew Gumkowski.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                        :

v.                        :

Matthew Gumkowski.                :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Matthew Gumkowski (defendant or Gumkowski), was found guilty by a jury of first-degree murder and first-degree arson. Gumkowski appeals his conviction on the basis of the denial of his motion for a new trial because, he argues, the weight of the evidence does not support the jury's verdict. After considering the parties' written and oral submissions and reviewing the record, we hold that the trial justice was not clearly wrong to deny the defendant's motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Procedural History**

On May 11, 2011, Michael DiRaimo's throat was slashed and his dwelling burned. On May 25, 2012, defendant was charged by indictment with murder and arson. A jury trial was held over three days in June 2016. At trial, the state presented testimony from six individuals. The testimony revealed the following.

On May 11, 2011, at 10:01 p.m., the fire department was called to 39 Sophia Street in Providence. Sean Reddy, who was an arson investigator in the Providence fire department, arrived at the scene at about 10:30 p.m. Reddy responded to that address to conduct "an origin cause

- 1 -

investigation to the fire." Upon viewing the interior of the burned structure, he observed a "male deceased victim lying on the floor." The victim was positioned face down. In accordance with protocol, the Office of the State Fire Marshal and the Office of the Medical Examiner were notified.

As part of his investigation, Reddy began "removing [the] debris from the fire scene[.]" During that process, Reddy noticed a laceration on the victim's neck and a "substantial amount of blood" underneath him. At that point, Reddy "immediately stop[ped,] * * * removed [himself] from the scene[,] and made the appropriate notifications to make sure everyone was aware of what [he] just observed[.]" Reddy testified that the victim's throat was slashed from right to left, "almost a complete[] 360 around his neck." With respect to the fire, Reddy classified it as "an incendiary arson fire[,]" having two separate points of origin.

Alexander Chirkov, M.D. was the acting Chief Medical Examiner for Rhode Island at the time of trial; he was an assistant medical examiner in 2011. He testified that on May 12, 2011, he was present at the autopsy of an individual identified as Michael DiRaimo.[1] The post-mortem examination revealed that DiRaimo was a white male, about forty-one years of age, who was "covered with soot[,] and [there was] evidence of first[,] second[,] and third degree burn [*sic*]" over his entire body. The interior of his neck was cut, and he had two four-centimeter puncture wounds on the palm of his right hand. DiRaimo's neck wound was a twelve-inch "cut wound on [the] interior neck from right to left, up to the anterior neck to the spinal vertebrae. * * * [I]n depth we're talking about [the] entire thickness of the anterior neck." The wound dissected the victim's

---

[1]Doctor Chirkov was in the autopsy room when George Lauro, M.D., who has since passed away, conducted the autopsy. Doctors Lauro and Chirkov had discussed the findings from the autopsy after its conclusion.

jugular vein, trachea,[2] and carotid artery. Doctor Chirkov testified that the wounds on the victim's hand were "classified as defensive wound[s] where the person tried to protect himself using his hands."

The autopsy also disclosed that there was no evidence of smoke inhalation, soot, or ashes in DiRaimo's throat, and that carbon dioxide levels in his blood were less than 0.1 percent—an amount consistent with a chronic smoker. Doctor Chirkov testified that, to a reasonable degree of medical certainty, the cause of DiRaimo's death was blood loss due to the wound to his neck. Doctor Chirkov testified that the manner of DiRaimo's death was homicide.

Detective Kenneth Court of the Providence police department testified that on May 11, 2011, he responded to 39 Sophia Street to investigate DiRaimo's death. Detective Court testified that there were no eyewitness accounts of either the arson or the homicide. Further, Det. Court testified that, to his knowledge, no murder weapon was found and defendant's DNA was not found at the crime scene. During his search for a suspect following the murder, Det. Court requested the victim's cell-phone records—phone calls, text messages, and cell-tower location information—for the period from April 16, 2011, to his death on May 11, 2011. A review of the victim's phone records revealed text and call communications between DiRaimo's cell-phone number and Gumkowski's cell-phone number. The trial justice permitted both the full call and text-message records between DiRaimo's phone and anyone with whom he was in contact, as well as an "outline" of all text messages and phone calls sent and received exclusively between defendant and DiRaimo from April 16 through May 11 to be admitted into evidence as full exhibits.[3]

---

[2] The trachea is colloquially known as the windpipe or air pipe.

[3] The state introduced the full subpoenaed text and call history into evidence, without objection. The trial justice also admitted into evidence the outline of the texts and calls exclusively between Gumkowski and DiRaimo, over defendant's objection.

Detective Court testified that DiRaimo's phone records show that the "vast majority" of DiRaimo's communications with Gumkowski were between May 10 and May 11, the day of the fire and homicide. The text message history portrayed a relationship between DiRaimo and defendant involving drugs and sex—with DiRaimo supplying the drugs in exchange for Gumkowski's sexual favors. Further, while DiRaimo occasionally referenced their sexual relationship in text messages, Gumkowski's texts to DiRaimo reveal that Gumkowski was concerned about the information disclosed in the messages. The day before DiRaimo was killed, Gumkowski objected to DiRaimo commenting by text message about their planned sex-for-drugs exchange; in response to Gumkowski asking DiRaimo if he still had "the 4 blue & 20[,]" DiRaimo confirmed, "Yes u got ur hands and mouth right lol[,]" but Gumkowski objected to DiRaimo's sexual reference, exclaiming, "dont write that shit mikey what if sum1 read ur phone!!"

A text message conversation that lasted from the evening before the homicide until the early morning on the day of the murder implied that a planned exchange between DiRaimo and Gumkowski had gone awry. Portions of that conversation are as follows, based upon the records of DiRaimo's cell phone provided by his cell-phone provider, Metro PCS.[4]

| Date/Time | From | To | Message |
|---|---|---|---|
| 5/10/2011 6:35 p.m. | DiRaimo | Gumkowski | I just talked 2 him he wants 2 know if u will buy 8 of them and i buy 4 of them he wont come all the way down here 4 less than that and he cant be here till 930 |
| 5/10/2011 6:35 p.m. | Gumkowski | DiRaimo | Thats fine |
| * * *[5] | * * * | * * * | * * * |
| 5/10/2011 8:39 p.m. | Gumkowski | DiRaimo | U want me 2 park around? |

---

[4] Notation in the following tables to DiRaimo and Gumkowski are in place of the cell-phone numbers of those individuals on the exhibit. It is undisputed that these respective cell-phone numbers are associated with the cell phones owned by Gumkowski and DiRaimo.

[5] Deletions in the table may signify the deletion of multiple lines of text messages from the exhibit. In addition, some of these omitted text messages were between DiRaimo and other individuals.

| 5/10/2011 8:39 p.m. | DiRaimo | Gumkowski | Yes like last time not in driveway |
|---|---|---|---|
| 5/10/2011 8:40 p.m. | Gumkowski | DiRaimo | K |
| 5/10/2011 9:07 p.m. | DiRaimo | Gumkowski | Ur a piece of shit u robed me and i got 2 pay 4 Them now |
| * * * | * * * | * * * | * * * |
| 5/10/2011 9:23 p.m. | DiRaimo | Gumkowski | Ur a crackhead u piece of fucking shit i will get u i got 2 pay 4 that i know where u work and 4 who |
| * * * | * * * | * * * | * * * |
| 5/10/2011 9:32 p.m. | DiRaimo | Gumkowski | If u dont answer me I will call u all nite |
| 5/10/2011 9:35 p.m. | DiRaimo | Gumkowski | If u dont answer me I will call u all nite |
| * * * | * * * | * * * | * * * |
| 5/10/2011 9:41 p.m. | DiRaimo | Gumkowski | Call me |
| 5/10/2011 9:43 p.m. | DiRaimo | Gumkowski | I have been 2 ur new house be4 |
| * * * | * * * | * * * | * * * |
| 5/10/2011 10:34 p.m. | Gumkowski | DiRaimo | U mad @ me? |
| 5/10/2011 10:43 p.m. | Gumkowski | DiRaimo | Hey u home? Im gunna cum by wit the loot 4 the blueberrys |
| * * * | * * * | * * * | * * * |
| 5/11/2011 1:26 a.m. | DiRaimo | Gumkowski | Fuck u |
| 5/11/2011 1:29 a.m. | Gumkowski | DiRaimo | I said sorry mikey!!! Ill cum c u 2marro I go the $ 4 u!! |
| 5/11/2011 1:31 a.m. | DiRaimo | Gumkowski | Dont bother after what u did 2 me i will never bother with u u do that 2 me i dont trust u i will pay the guy why would u do that 2 me |

Nonetheless, several hours later, around noon on May 11, 2011, DiRaimo reached out to Gumkowski about meeting for payment and whether Gumkowski wanted "the other 7 [pills]." Around that same time, Gumkowski also agreed to give DiRaimo a ride to West Warwick:

| 5/11/2011 12:00 p.m. | DiRaimo | Gumkowski | K do u want the other 7 i showed u cause i have them i sent u a pic |
|---|---|---|---|
| 5/11/2011 12:00 p.m. | DiRaimo | Gumkowski | U want 2 meet me in w warwick at 4.30 |
| 5/11/2011 12:02 p.m. | Gumkowski | DiRaimo | Ok |

| 5/11/2011 12:03 p.m. | DiRaimo | Gumkowski | Ok what u want the 7 more or ok u will meet me at shell at 4.3o or both |
|---|---|---|---|
| 5/11/2011 12:04 p.m. | Gumkowski | DiRaimo | Both & why @ shell? |
| 5/11/2011 12:04 p.m. | Gumkowski | DiRaimo | U need a ride home? |
| * * * | * * * | * * * | * * * |
| 5/11/2011 1:29 p.m. | DiRaimo | Gumkowski | Matt i am going 2 be home so call me when u can come here i can ride back 2 west warwick with u later |

Later that day, Gumkowski did not respond to DiRaimo's messages telling Gumkowski that DiRaimo had to pay his own drug dealer by 7 p.m. and asking Gumkowski what time he would arrive. DiRaimo then called defendant a "crack head" via text message and asserted that defendant's only value derived from the sexual favors he performed for DiRaimo. Gumkowski responded two hours later: "I just got up, real nice txt! Now u go fuck urself hahahahahahahahahaha[.]" At that point, DiRaimo began threatening to tell Gumkowski's boss, "baby mother[,]" and the people Gumkowski lived with about their sexual relationship and that Gumkowski was supposedly a thief. After some back and forth, Gumkowski apologized, agreed to see DiRaimo after he ate, and reminded DiRaimo that he owed him a massage:

| 5/11/2011 5:49 p.m. | DiRaimo | Gumkowski | Fu u were never paying me i better never see u in w warwick crackhead every1 will know u suck dick ur bosses |
|---|---|---|---|
| * * * | * * * | * * * | * * * |
| 5/11/2011 5:50 p.m. | Gumkowski | DiRaimo | Ok they all no!! |
| * * * | * * * | * * * | * * * |
| 5/11/2011 5:52 p.m. | DiRaimo | Gumkowski | The people u live with will no u suck dick and ur a thief dont show ur face in w warwick bitch I should of came in ur mouth last nite i will be at ur house |
| 5/11/2011 5:53 p.m. | DiRaimo | Gumkowski | Tomorrow nite 2 let them know i was going 2 give u 7 more and take the loss but now fu haha |
| * * * | * * * | * * * | * * * |
| 5/11/2011 5:59 p.m. | Gumkowski | DiRaimo | Fuck i said fuckin sorry mike!! Ill b there afta i eat!! |

| 5/11/2011 6:01 p.m. | Gumkowski | DiRaimo | Fine & i owe u a massage!! Im a man of my word!! |
| 5/11/2011 6:02 p.m. | DiRaimo | Gumkowski | Ok |

At 6:47 p.m., Gumkowski texted DiRaimo that he was leaving to meet DiRaimo "shortly[.]"

In addition to these text messages, DiRaimo and Gumkowski placed numerous calls to one another—some were answered, and some were not answered. For example, DiRaimo, via text message at 9:35 p.m. on May 10, 2011, threatened to call Gumkowski "all nite" when he believed that Gumkowski had stolen drugs from him, and then proceeded to place approximately sixty calls to Gumkowski between 10:12 and 10:56 that night. Most of those calls were unanswered, but Gumkowski did place a seventeen-second call to DiRaimo at 10:25 that night.

Detective Court testified that the last phone call from DiRaimo to Gumkowski was at 8:42:19 p.m. on May 11—the night of the arson and homicide—about an hour and twenty minutes before the fire department was alerted. That call lasted fifty-one seconds. After that 8:42 p.m. call, there were two more incoming calls to DiRaimo's phone that night that "have a corresponding tower[,]" indicating that DiRaimo's phone was on. Those calls occurred at 9:43:25 p.m. and 10:45:26 p.m. on May 11, 2011, and corresponded to cell tower numbers seventy-three and fifty-nine, respectively. The location of cell tower number seventy-three is on Briggs Street in Cranston, and cell tower number fifty-nine is on Old Switch Road in Hopkinton. The arson and murder occurred at 39 Sophia Street, Providence—near cell tower seventy-three. And, at the time, Gumkowski resided about forty miles away in a house on Spring Street in Hopkinton. The location of cell tower number fifty-nine is within a mile of Gumkowski's residence in Hopkinton, where Det. Court ultimately discovered DiRaimo's cell phone among Gumkowski's belongings on August 3, 2011. At least another twenty calls to DiRaimo's cell phone, between May 12 and May

18, 2011, did not have corresponding towers, which, Det. Court testified, indicates that the phone was turned off sometime after the call that was received at 10:45:26 p.m. on May 11.

After Det. Court discovered DiRaimo's cell phone at the place where defendant had resided at the time of the murder, Detective Ralph Costantino, a crime scene investigator who is employed by the Providence police department in the Bureau of Criminal Identification, examined the phone in Det. Court's presence. Detective Court testified that, when Det. Costantino powered up the phone, the phone displayed DiRaimo's phone number. Further, when Det. Costantino opened the phone and removed the battery, Det. Court observed that the serial number matched DiRaimo's phone's serial number, indicating that the phone was, in fact, DiRaimo's phone. Detective Costantino took a DNA sample from Gumkowski, and he also took four swab samples off the phone to test for DNA.

Tamara Wong, senior forensic scientist at the Rhode Island Department of Health Forensic Science Laboratory, testified as an expert in the field of forensic DNA. Wong developed a DNA profile for Gumkowski using the sample that Det. Costantino had taken from Gumkowski. She was unable to produce a profile from three of the four samples that Det. Costantino had taken from the phone, but one sample from the back of the phone "resulted in a partial mix DNA profile." Wong then compared the two samples and found that Gumkowski could not be excluded as a contributor to the DNA that was found on the back of DiRaimo's cell phone. In fact, she found that it "is 52 trillion times more likely" that Gumkowski did contribute to the partial DNA found on the back of DiRaimo's cell phone than did some other unknown person. However, Wong testified on cross-examination that she could not determine when or how the DNA got on the phone.

Julianna Hollister testified that, in 2011, Gumkowski lived with her and her husband on Spring Street in Hopkinton. In the spring of 2011, she asked Gumkowski to leave and not come back to the property, placed some of his clothing at the end of the driveway, and otherwise left the room in which Gumkowski had stayed untouched. Again, as Det. Court testified, the victim's cell phone was discovered on August 3, 2011, in the room where Gumkowski had resided at the time of the murder.

After the state's last witness testified, the defense rested. The jury returned with a guilty verdict on both counts on June 13, 2016. The defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The motion was heard on July 12, 2016, and the trial justice denied the motion in an oral decision rendered at the end of the hearing on the same day. The defendant was sentenced on September 6, 2016, to a mandatory life sentence for the first-degree murder conviction and a consecutive forty-five-year sentence for the first-degree arson conviction.[6] Gumkowski filed the instant appeal on September 12, 2016.

## II

## Standard of Review

The defendant appeals from the trial justice's denial of his motion for a new trial. As we have oft repeated, "when a trial justice is presented with a motion for a new trial based on the weight of the evidence, he or she acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Johnson*, 199 A.3d 1046, 1050-51 (R.I. 2019) (brackets omitted) (quoting *State v. Gomez*, 116 A.3d 216, 223 (R.I. 2015)). "The trial justice must consider the evidence in light of the jury charge, then independently assess

---

[6] The defendant also had been convicted of similar, but unrelated, crimes in Massachusetts; and, as such, the trial justice ordered that these sentences are to "run consecutive to * * * the Massachusetts sentences."

the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." *Id.* at 1051 (brackets omitted) (quoting *Gomez*, 116 A.3d at 223). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Gomez*, 116 A.3d at 223). "Only when the trial justice does not agree with the jury's verdict, must he or she embark on a fourth analytical step." *Id.* (brackets omitted) (quoting *Gomez*, 116 A.3d at 223).

"This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Johnson*, 199 A.3d at 1051 (deletion omitted) (quoting *Gomez*, 116 A.3d at 223). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Gomez*, 116 A.3d at 223).

### III

### Discussion

On appeal, defendant argues that the trial justice was clearly wrong when she denied his motion for a new trial because, according to defendant, the verdict was against the weight of the evidence.[7] Specifically, Gumkowski argues that the evidence did not support a finding that he was the murderer and that the evidence did not support a finding of premeditation beyond a reasonable

---

[7] While defendant was convicted of first-degree arson, he does not provide an argument on appeal, beyond conclusory statements, that the guilty verdict pertaining to arson was against the weight of the evidence.

doubt. We begin by recognizing that, in this case, the "trial justice applied the correct standard for assessing the motion for a new trial and articulated sufficient grounds for denying the motion; [her] decision is therefore entitled to great weight and deference pursuant to our well established standard of review." *Johnson*, 199 A.3d at 1051.

**A**

Gumkowski argues that the evidence did not support a finding that he was the perpetrator because: (1) the text messages did not prove motive; (2) the fact that DiRaimo's cell phone was ultimately found among Gumkowski's belongings supports, at most, a finding of theft; and (3) the excerpted text history between Gumkowski and DiRaimo entered by the state as a full exhibit was misleading because it led the jurors and the trial justice to overlook DiRaimo's full text-message history—which was also entered as a full exhibit.

The crime of murder is defined, in relevant part, as "[t]he unlawful killing of a human being with malice aforethought * * *. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree. Any other murder is murder in the second degree." General Laws 1956 § 11-23-1. "Although motive is not an essential element of murder, 'evidence of motive is often probative and relevant, and therefore admissible in proper circumstances.'" *State v. Pule*, 453 A.2d 1095, 1098 (R.I. 1982) (brackets omitted) (quoting *State v. Gazerro*, 420 A.2d 816, 825 (1980)). In *Pule*, the Court held that "evidence of motive was admissible to prove that defendant was the person who committed the criminal act." *Id.* (citing *McCormick's Handbook of the Law of Evidence* § 190 at 450-51 (2d ed. Cleary 1972)).

The text messages between DiRaimo and Gumkowski depict a relationship that was based on drugs, sex, money, and secrets. The day before the murder, Gumkowski asked DiRaimo via

text message, "U got the 4 blue & 20 rite?"; to which the victim responded, "Yes u got ur hands and mouth right lol[.]"  In response to the drugs-for-sex exchange DiRaimo was referencing, Gumkowski alluded to wanting to keep the sexual nature of their relationship secret: "Lol dont write that shit mikey what if sum1 read ur phone!!"  DiRaimo responded, "Nobody ever reads my phone it is always with me[.]"  Shortly thereafter, at around 9 p.m. on the day before DiRaimo was murdered, DiRaimo appeared to become increasingly enraged with Gumkowski, apparently accusing Gumkowski of taking DiRaimo's drugs without having paid for them.  In a period of little more than a half-hour, DiRaimo sent seventeen unanswered text messages to defendant, stating, *inter alia*: "Ur a piece of shit u robed me and i got 2 pay 4 Them now[,]" and "Ur a crackhead u piece of fucking shit i will get u i got 2 pay 4 that i know where u work and 4 who[.]"

On the day of the murder, at around noon, DiRaimo and Gumkowski had apparently reconciled enough to arrange for Gumkowski to meet with DiRaimo to pay for the drugs; however, by that evening, DiRaimo sent Gumkowski a slew of messages threatening Gumkowski, calling him names, and stating that he was only good for sexual favors.  DiRaimo went on, at about 6 p.m., to threaten to reveal their sexual relationship to Gumkowski's boss, the mother of his child, and the people with whom he lived.  Gumkowski replied, "Ok they all no!!" and "Ok[.]"  Thereafter, Gumkowski apologized to DiRaimo and said that he would meet DiRaimo after he ate.  By 6:47 p.m. on the day of the murder, Gumkowski texted DiRaimo that he was leaving to meet DiRaimo soon, and about an hour later Gumkowski texted, "U got the 7 still? Get a spoon * * * Im hurtin[.]"

The trial justice recounted these messages in her bench decision denying defendant's motion for a new trial.  In the process, she remarked that defendant's apparently passive responses to DiRaimo's threats to expose their sexual relationship seemed to contradict defendant's earlier

concern about alluding to the sexual aspect of DiRaimo's and Gumkowski's relationship in text messages for fear that someone would see the messages. She also highlighted the fact that there were telephone calls—some lengthy—between DiRaimo and Gumkowski during this time period. Further, the trial justice found that "the jury reasonably inferred that [d]efendant had something to be concerned about, an angry and vengeful DiRaimo who was threatening to reveal information to others about [d]efendant * * * and [d]efendant knew it." We are satisfied that the trial justice was not clearly wrong in concluding that the jury could have reasonably inferred motive from the text messages between DiRaimo and Gumkowski; as she stated, "the jury reasonably inferred as does the [c]ourt the [d]efendant went to DiRaimo's house, killed him, set the house on fire to cover up the murder, took the phone and went home, and it was indeed the [d]efendant who took the phone."

She also concluded that the jury was justified in finding that the evidence of DiRaimo's cell-phone location based on the "pings" from the cell towers was credible and that the jury made a reasonable inference that Gumkowski took the phone from DiRaimo's dwelling to his own residence, where the phone was eventually found. The text-message exchanges demonstrate that the trial justice did not misconceive the evidence when she concluded that the jury could have reasonably inferred that "DiRaimo never voluntarily would have given anyone his phone" and that "[e]ven if [defendant] killed DiRaimo and had left the phone behind, the damaging information would come out. He had motive to silence DiRaimo, and he had motive to steal the cell phone."

The defendant also contends that the trial justice erred by reviewing only the text history between Gumkowski and DiRaimo, thus overlooking the complete record of DiRaimo's text messages entered into evidence.[8] According to defendant, DiRaimo's entire text history reveals

---

[8] While the trial justice admitted the excerpted text messages and phone calls over defendant's objection pursuant to Rule 1006 of the Rhode Island Rules of Evidence, we note that the excerpt was not admitted in lieu of the full text-message history, but in addition to it. *See* R.I. R. Evid.

- 13 -

him to be an opioid dealer who led a complicated and very stressful life. The complete messages, defendant asserts, demonstrate that DiRaimo was surrounded by a "constellation of troubled individuals" in a world where exchanges of drugs for sex were common. The defendant suggests that a number of men may have had a motive to murder DiRaimo.

The complete compilation of text messages that the state introduced into evidence is indeed voluminous. In her decision denying defendant's motion for a new trial, the trial justice carefully reviewed the communications between defendant and DiRaimo in the hours immediately before DiRaimo's murder. She noted that DiRaimo was furious that defendant had not paid him for drugs, money that DiRaimo in turn owed to his own drug dealer. The trial justice reviewed the "pages and pages of text messages from DiRaimo to Gumkowski between 9:07 p.m. on May 10th and May 11th within the hour of the time of the murder." The trial justice also referenced an additional sixty phone calls made by DiRaimo to defendant during this time period.

In addition, the trial justice noted the two incoming calls to DiRaimo's cell phone that had pings off nearby cell towers: one at 9:30 p.m. near DiRaimo's home, and one at 10:45 p.m. near the home where defendant was living in Hopkinton. The trial justice further noted that the fire at the location where DiRaimo was found murdered was reported during that time period, at 10:01 p.m. The trial justice did not indicate whether she relied solely or more heavily on either the state's exhibit that outlined the text messages and phone calls between Gumkowski and DiRaimo or the exhibits that listed DiRaimo's full call and text-message history.

---

1006 ("The contents of voluminous writings * * * which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.").

Moreover, both the complete compilation and the excerpted text messages and phone calls were made available to the trial justice and the jury. In light of the overwhelming circumstantial evidence that places defendant at DiRaimo's home prior to and around the time of the murder and fire, reflects DiRaimo's increasing anger at defendant in the hours leading up to the murder, and demonstrates that DiRaimo's cell phone was eventually retrieved with defendant's belongings, we are convinced that neither the trial justice nor the jury were misled by the state's exhibit outlining only the text messages between defendant and DiRaimo.

**B**

Gumkowski also asserts that the verdict was against the weight of the evidence because the evidence did not support a finding of premeditation.[9] In clarifying the meaning of "premeditation" in *State v. Gillespie*, 960 A.2d 969 (R.I. 2008), this Court focused on "the *duration* of the defendant's intent to kill" when distinguishing between first- and second-degree murder. *Gillespie*, 960 A.2d at 977. In that case, this Court stated that "[f]irst-degree murder requires that the defendant harbored a more-than-momentary intent to kill prior to committing the homicide—in essence, that he or she acted with premeditation." *Id.* In other words, "[t]he premeditation necessary to establish first-degree murder must have existed for some appreciable length of time before the killing; it must have existed for more than just a moment." *State v. Amazeen*, 526 A.2d 1268, 1271 (R.I. 1987). On the other hand, if the intent only "involves a fleeting intent that is

---

[9] The state responds in its submission to this Court that defendant has waived the issue of "[i]nsufficient evidence of premeditation[.]" As defendant points out, however, Gumkowski never argued, and does not now argue, that he is entitled to a new trial based on the insufficiency of the evidence, but instead filed and argued his motion for a new trial based solely on a weight-of-the-evidence argument.

contemporaneous with the murder[,]" then the defendant would be found guilty of second-degree murder. *Gillespie*, 960 A.2d at 977.

The defendant argues that the evidence did not support a finding of premeditation for three reasons: (1) there was no evidence of planning; (2) no reasonable juror could infer premeditation from the text messages between DiRaimo and defendant; and (3) there is no evidence indicating that the defensive wounds on DiRaimo's hand would have taken more than a mere moment to inflict, and thus should have been considered "simultaneous or near-simultaneous injuries[.]" Evidence of a plan, however, is not a requirement for proving premeditation. *See Gillespie*, 960 A.2d at 977. Nor did defendant need to have formed the intent to kill DiRaimo during their text or phone conversations. All that is needed is for defendant to have "harbored a more-than-momentary intent to kill prior to committing the homicide[.]" *Id.*

The defendant made only a passing reference to premeditation in his oral argument in support of the motion for a new trial. The trial justice did address this issue, however, in her decision; therefore we are satisfied that it has been preserved for appellate review. On appeal, defendant argues that there was no evidence of any planning or preparation, and no evidence that the perpetrator even brought a weapon to the scene. Nor do the text messages provide evidence of premeditation or the act of killing itself, according to defendant. We disagree.

The trial justice remarked in her decision: "The evidence was overwhelming that someone committed first degree murder in the killing of Michael DiRaimo. His throat was slashed almost from ear to ear. It was particularly malicious." Indeed, the photographs admitted into evidence suggest a near decapitation. Doctor Chirkov, whom the trial justice characterized as a credible witness, testified that DiRaimo had a twelve-inch wound on his neck, the depth of which was "about [the] entire thickness of the anterior neck[,]" which dissected "the jugular vein on the right

- 16 -

with dissection of the air pipe and dissection of the carotid artery." Doctor Chirkov further testified that the autopsy disclosed two puncture wounds on the palm surface of the deceased's right hand. He commented that "usually this type of wound [is] classified as a defensive wound where the person tried to protect himself using his hands."

We are of the opinion that it was reasonable for the trial justice and jury to conclude that, as the trial justice noted in her bench decision denying the defendant's motion for a new trial, this homicide "was done with more than a moment's reflection." The defensive wounds on DiRaimo's hand, together with the vicious, forceful nature of the throat slashing, supports a finding of a murder that was "willful, deliberate, malicious, and premeditated[.]" Section 11-23-1. The trial justice did not "overlook[] or misconceive[] material evidence[,]" nor was she "otherwise clearly wrong." *Johnson*, 199 A.3d at 1051 (quoting *Gomez*, 116 A.3d at 223). In fact, she "articulated adequate grounds for denying the motion," and thus "her decision is entitled to great weight and will not be overturned by this Court[.]" *Id.* (quoting *Gomez*, 116 A.3d at 223).

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record in this case may be returned to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Matthew Gumkowski. |
| **Case Number** | No. 2018-42-C.A. (P1/12-1584A) |
| **Date Opinion Filed** | January 9, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br>For Defendant:<br><br>Kara J. Maguire<br>Office of the Public Defender |