June 28, 2021

**Supreme Court**

No. 2020-84-C.A.
No. 2020-18-M.P.
(P1/18-33AG)

State          :

v.          :

Xavier Vidot.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :

v.            :

Xavier Vidot.        :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The defendant, Xavier Vidot, was convicted by a jury of one count of second-degree murder and one count of discharging a firearm during a crime of violence, thereby causing death. He was sentenced to twenty-four years' imprisonment for the second-degree-murder conviction and a consecutive mandatory life sentence for the discharge-of-a-firearm conviction.

On review, defendant contends that the trial justice erred by (1) failing to declare a mistrial and (2) denying defendant's motion for a new trial. The defendant maintains that each of these errors entitles him to have his conviction vacated and to be granted a new trial. After careful consideration of defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

- 1 -

# I

## Facts and Travel

On July 18, 2017, an Attleboro, Massachusetts, police officer made a grisly discovery—a human corpse that had been set afire and abandoned. Through fingerprint analysis, the police were able to identify the decedent as Valdez Loiseau (Valdez).[1] Prior to his death, Valdez resided at 15 Edgewood Avenue in Cranston with his girlfriend Melonie Perez (Melonie) and her son, defendant.[2]

On January 10, 2018, defendant was charged by indictment with murder and use of a firearm during a crime of violence. Melonie was also charged by indictment with failure to report a death and misprision of a felony. A codefendant jury trial began on October 1, 2018; however, Melonie pled guilty in the middle of trial. At trial, the state called thirteen witnesses. The defendant presented two witnesses— himself and his grandmother, Martha Perez (Martha), who is Melonie's mother. The testimony revealed the following.

Around July 2016, Valdez moved into 15 Edgewood Avenue after a friend of Melonie's "vouched for him" and explained that "he needed a place to stay." Valdez

---

[1] Throughout trial, the decedent was referred to by various names including "Swepp," "Swapp," "Loiseau," "Valdez," and "Val." In the portions of the trial transcript most relevant to this appeal, the decedent was frequently referenced as Valdez. Therefore, for the sake of consistency, we will refer to the decedent as Valdez throughout this opinion. No disrespect is intended.
[2] Throughout this opinion, we refer to defendant's mother and grandmother by their first names solely for the sake of clarity. No disrespect is intended.

paid rent and had his own room in the house. He also used a room as a recording "studio" to further his nascent career as a rap musician. After several months of living in the home, Valdez began dating Melonie.

On the afternoon of July 17, 2017, Valdez and Melonie left the house in Melonie's vehicle. Shortly thereafter, Melonie returned home alone and told defendant that Valdez had wrecked her car. The defendant went outside and observed the damaged vehicle. Approximately twenty-five minutes later, Valdez returned home upset that Melonie had left him at the scene of the accident. The defendant then heard Valdez and Melonie arguing for "hours."

At some point during the argument, Martha received a call from Melonie's phone, during which she heard Melonie "crying and screaming" and "heard somebody else's screaming." Martha immediately drove to 15 Edgewood Avenue. When she entered the home, she heard screaming upstairs. She then rushed upstairs and was met by Melonie; Melonie appeared intoxicated and ran toward Martha exclaiming, "Mommy, Mommy, Mommy, he wrecked my car."

Valdez then entered the hallway, where Martha and Melonie were standing, and, according to Martha, he "went and grabbed Melonie." Martha observed that Valdez also appeared to be intoxicated. The defendant attempted to separate Melonie and Valdez, and, eventually, Melonie left the home.

Valdez followed Melonie out of the home, and Martha and defendant went after them. Melonie and Valdez entered a corner store that was located a few doors away from the home, and then Melonie returned home and locked the door. Martha and defendant watched as Valdez repeatedly banged on the door and called Melonie's name, but Melonie did not open the door to let him in. Martha then left, "because Melonie was locked in the house[,]" and Martha believed "[s]he was safe in the home."

The defendant testified that, after Martha left, Valdez climbed up onto the porch, "pushed in the AC that was in his room[,]" and entered the home. The defendant then also entered the home by climbing through an unlocked kitchen window. The defendant testified that, once inside the home, he remained on the first floor, where he could hear Melonie and Valdez arguing upstairs.

At some point during the argument, defendant heard a loud bang and rushed upstairs, where he found Melonie on the floor in the corner of the room, while Valdez was "pacing" and "ranting" with a gun in his hand. The defendant testified that he also observed a gun "on the bed directly in front [of] where she is sitting." The defendant testified that Valdez dropped the gun he was holding, and defendant removed both guns from the room—placing one under the mattress in a spare bedroom upstairs and placing the other under the couch cushions on the first floor.

The defendant testified that he was seated on the first-floor couch—where he had hidden one of the guns—when he "heard a loud, loud scream from [his] mother." He then put the gun in his waistband and ran upstairs. Upon reaching the bedroom, defendant observed Valdez pulling Melonie up by her hair and smacking her a few times in the stomach. The defendant testified that he was attempting to move Valdez away from Melonie when Valdez spun around "aggressively" and "rushed" defendant. The defendant said he then pulled out the gun and shot Valdez. Valdez fell to the floor, and defendant attempted to fire a second shot but the gun "did not fire for whatever reason." The defendant testified that he "still thought [Valdez] could have been a threat[,]" so he retrieved the second gun from the spare room and shot Valdez in the head as Valdez was "trying to lift himself up[.]"

After the shooting, Melonie called her ex-boyfriend, James Clark, and asked him to help dispose of the body. Clark testified that defendant told him that he had killed Valdez; defendant explained to Clark that he shot Valdez after Valdez had "lunged at him[.]" Melonie and defendant wrapped Valdez's body in sheets and loaded it into the trunk of Clark's car. Clark and Melonie then got into the vehicle while defendant retrieved a gas container. Clark testified that, once all three were in the vehicle, Melonie instructed him to drive to Pawtucket. Melonie further directed Clark to a "secluded" area where he stopped the vehicle. Clark testified that he remained in the vehicle while Melonie and defendant removed Valdez's body from

the trunk.  He further testified that he observed defendant lighting a fire before he returned to the vehicle.

After seven days of testimony, the jury found defendant not guilty of first-degree murder, guilty of second-degree murder, and guilty of discharging a firearm during a crime of violence, thereby causing the death of Valdez Loiseau.  On October 22, 2018, defendant filed a motion for a new trial.  The motion was heard on October 24, 2018, and the trial justice denied the motion in an oral decision that was rendered at the end of the hearing on the same day.  On April 1, 2019, defendant was sentenced to twenty-four years' imprisonment for the second-degree-murder conviction and a consecutive mandatory life sentence for the conviction for discharge of a firearm during a crime of violence, thereby causing death.  A judgment of conviction entered on that same day, and defendant sought review. [3]

---

[3] The record reveals that while defendant attempted, through counsel, to file a notice of appeal in the Superior Court on April 1, 2019—the date of the entry of the judgment of conviction—the filing was erroneously returned for failure to comply with the court rules.  The defendant filed a petition for writ of certiorari to review his conviction on January 16, 2020, which we granted on February 19, 2020 (No. 2020-18-M.P.).  The defendant's appeal was subsequently docketed in this Court on March 6, 2020 (No. 2020-84-C.A.); and, by order dated April 24, 2020, we consolidated the two matters before the Court.

## II

## Discussion

On review, defendant first argues that the trial justice erred by failing to declare a mistrial. Second, defendant argues that the trial justice erred in denying defendant's motion for a new trial.

## A

## Failure to Declare a Mistrial

The defendant asserts two claims of error with regard to the trial justice's failure to declare a mistrial. First, he claims that the trial justice erred "in failing to declare a mistrial at the close of the [s]tate's case due to the prosecutor's improper introduction of prejudicial out-of-court statements of a witness not available for trial[,]" in violation of defendant's rights under the Confrontation Clause of the United States Constitution and article 1, section 10 of the Rhode Island Constitution. Second, he argues that the trial justice erred in failing to grant a mistrial given the prosecutor's "improper suggestions and assertions of personal knowledge in his closing argument, which included unduly prejudicial scientific statements not presented as evidence in trial[.]"

## 1

## Confrontation Clause

The defendant avers that the prosecutor improperly "introduced testimonial

statements by a nontestifying witness to be used against the defendant, thus implicating the Confrontation Clause." During the prosecution's cross-examination of defendant, the following exchange occurred:

"[PROSECUTOR:] And isn't it true you told Jeremy Palmer on a phone call on the 18th of July, 2017, that, quote, [Valdez] is on permanent vacation?

"[DEFENDANT:] I don't recall.

"[PROSECUTOR:] Isn't it true that you told Jeremy Palmer on that same day, the same phone call, that the problem is solved?

"[DEFENDANT:] I don't recall this conversation. I remember making a call. I don't remember what was said or how the conversation went at all.

"[PROSECUTOR:] But you do admit you called him the following day.

"[DEFENDANT:] Yes.

"[PROSECUTOR:] And you talked about what had happened the night before.

"[DEFENDANT:] I assume so. I don't know.

"[PROSECUTOR:] Your Honor, approaching the witness with [s]tate's 157 for identification, the statement of Jeremy Palmer, specifically Page 4, line 150.

"* * *

"[DEFENDANT:] All right. I read it, line 150 to line 155.

"[PROSECUTOR:] Do you recall now saying to Jeremy Palmer that, [Valdez is] on permanent vacation and that he's—the problem is solved?

"[DEFENDANT:] I still don't recall ever saying that."

The defendant did not raise a contemporaneous objection during trial; however, defendant now argues, for the first time on review, that "[b]ecause of this line of questioning and presentation of Mr. Palmer's statement to the defendant, the jury was able to readily infer the content of Mr. Palmer's untested, out-of-court testimonial statement."

Further, defendant avers that the prosecutor "compounded the harm" when the prosecutor highlighted this testimony in his closing argument:

"[The defendant] also describes this person to—which a phone call, which he admits happened to his former—now former friend Jeremy Palmer that there was a problem, aka [Valdez] was the problem and the problem was fixed.

"Now, the only thing we know is that Jeremy Palmer wasn't in that room on the 17th of July of 2017. Jeremy Palmer wasn't outside the house the next day. So if he wasn't in either of those spaces, he wasn't in the car, that means [defendant] had termed Valdez Loiseau a problem prior to seeing him assault his mother, in his words, for the first time. Already a problem. Already a problem. Apparently whatever happened that night, maybe that was just the last straw. Already a problem, because he flippantly describes him as permanently on vacation. Permanently on vacation."

Again, defendant did not object to the prosecutor's reference to Palmer in the prosecutor's closing argument, nor did defendant raise this issue in his motion for a new trial.

## 2

## Closing Argument

The defendant also argues that, during closing arguments, the prosecutor made "improper suggestions based on scientific evidence, not introduced at trial, but instead through assertions of his own personal knowledge." During his closing arguments, the prosecutor stated the following:

> "Now, recall that [defendant] says he's never handled a firearm before in his life, yet he pulls off what is the most incredible pistol draw, I submit, you will ever hear about, because he not only reacts within a split second, but he manages to get the gun out of his waistband, which— jeans, not a holster, out of his waistband, and somehow draw it up to a person that is coming towards him with a lot of force, very fast, somehow he gets this gun up, even though he's reacting to Valdez—Valdez, by his story, reacted first. Valdez makes the first move. Coming right at him.
>
> "I submit to you that that is impossible, not only because the relations of the body and him having to pull from his waistband to getting that up, he would have hit Valdez in the chest as he came forward. He would have never got that gun up. The gun would have misfired to the left. He would have never been able to get that pistol draw off.
>
> "Now, back in my younger days, I used to be a little faster. I used to be track and field. You have starting

blocks, and somebody gets down on the blocks. You've all seen the Olympics. Guy fires a starters pistol, people go off. There's something called a false start. And that's when somebody reacts too fast for a human to react having heard a sound. That—that limit is .12. If you react faster than that, you're basically guessing. .12. That's .12. In that, he pulled out—perceived a threat, pulled the gun, aimed a shot, fired it, in that fast. That is incredible.

"I submit to you that the only way he would have been able to shoot Valdez Loiseau as he did, as we know he must have, because he, number one, he told us he shot him in the chest, but also because the stippling tells us that it was a close-range shot, somewhere around inside three feet. Had to have walked in, had to have had the gun out. Had to have had the gun out already. It's the only way physics allows for that shot to happen the way it must have, based on the stippling, based on the bullet track. There was no gun pull. There was no lunge. That didn't happen, because it's incredible for it to have happened."

**3**

**Standard of Review**

"A trial justice's decision to deny a motion for mistrial is accorded great weight and will not be disturbed on appeal unless it is clearly wrong." *State v. Doyle*, 235 A.3d 482, 511 (R.I. 2020) (quoting *State v. Enos*, 21 A.3d 326, 332 (R.I. 2011)). However, "[t]he raise-or-waive rule imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." *State v. Mensah*, 227 A.3d 474, 483 (R.I. 2020) (quoting *State v. Andrade*, 209 A.3d 1185, 1194 (R.I. 2019)). "[I]f an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal." *Doyle*, 235 A.3d at 511 (quoting *State*

- 11 -

*v. Pona*, 66 A.3d 454, 468 (R.I. 2013). "We require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.* (quoting *Pona*, 66 A.3d at 468).

**4**

**Analysis**

Despite defendant's claim that the trial justice erred in failing to declare a mistrial, the record reveals that defendant never moved for a mistrial. "A mistrial in a criminal trial is an extreme remedy and should be granted only when there is a fundamental defect in the proceeding that cannot be cured, such that the defendant will be deprived of a fair trial." *Doyle*, 235 A.3d at 507. "The grounds for the motion should be clearly articulated and the state is entitled to an opportunity to respond." *Id.* "When confronted with a motion for a mistrial, the trial justice is charged with evaluating the basis for the motion, in order to determine whether a juror voir dire is warranted and, in the exercise of discretion, decide whether the potential prejudice can be cured by an immediate cautionary instruction." *Id.* "A trial justice is never permitted to grant a mistrial sua sponte unless there exists manifest necessity or the ends of justice require a mistrial." *State v. Silva*, 685 A.2d 1072, 1073 (R.I. 1996) (mem.) (citing *United States v. Dinitz*, 424 U.S. 600, 606-07 (1976)).

Here, the trial justice was never asked to consider whether the state's references to Palmer's statements were in violation of defendant's rights under the

Confrontation Clause, and, thus, defendant's appellate arguments on this issue have been waived. Further, with respect to the prosecutor's reference to purported scientific evidence during closing argument, defendant did not object nor request a cautionary instruction; thus, defendant's appellate arguments on this issue have also been waived.[4] Moreover, neither issue that defendant identifies rises to the level of manifest necessity; consequently, a sua sponte declaration of a mistrial by the trial justice would have been improper. *See Silva*, 685 A.2d at 1073; *cf. Doyle*, 235 A.3d at 507 ("A classic example of manifest necessity is a deadlocked jury.").

Therefore, the trial justice did not err in failing to grant a mistrial, as defendant argues, because the grounds for a mistrial that defendant raises before us were never articulated before the trial justice "and, significantly, the state was never called upon nor given an opportunity to respond." *Doyle*, 235 A.3d at 507.

**B**

**Motion for a New Trial**

The defendant next argues that the trial justice erred in denying defendant's motion for a new trial. The defendant avers that "the trial judge misapplied the duty

---

[4] We pause to note that a timely objection would have allowed the trial justice to "decide whether the potential prejudice c[ould have] be[en] cured by an immediate cautionary instruction." *State v. Doyle*, 235 A.3d 482, 507 (R.I. 2020). Although the lack of objection denied the trial justice the opportunity to make this determination, the record reveals that the jury was properly instructed by the trial justice that the "statements of lawyers are not evidence."

- 13 -

to retreat rule and overlooked material evidence that raised issues of fact in support of his self-defense claim."

**1**

**Standard of Review**

"Under the 'oft-repeated' and 'well settled' test this Court applies when reviewing a motion for a new trial, we examine whether the trial justice acted as a 'thirteenth juror' and exercised his or her 'independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Stokes*, 200 A.3d 144, 152 (R.I. 2019) (quoting *State v. Cerda*, 957 A.2d 382, 385 (R.I. 2008)). "When considering a motion for [a] new trial, the trial justice must undertake a three-step analysis: '(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" *Id.* (quoting *State v. Greenslit*, 135 A.3d 1192, 1197 (R.I. 2016)).

"If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *State v. Johnson*, 199 A.3d 1046, 1051 (R.I. 2019) (quoting *State v. Gomez*, 116 A.3d 216, 223 (R.I. 2015)). "Only when the trial justice does not agree with the jury's verdict, must he or she embark on a fourth analytical step." *Id.* (brackets omitted) (quoting *Gomez*, 116 A.3d

at 223). "This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses[.]" *Id.* (quoting *Gomez*, 116 A.3d at 223). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Gomez*, 116 A.3d at 223).

## 2

### Analysis

Here, defendant specifically argues that the trial justice erred in denying the motion for a new trial because "reasonable minds could not differ that [defendant's] use of deadly force against the substance-crazed and enraged Valdez Loiseau was indisputably in self-defense and the court misapplied the duty to retreat rule[.]" During the hearing on the motion for a new trial, defense counsel argued that "[t]he evidence shows that the defendant fired that first shot in self-defense[,]" and that "the second shot didn't matter because the first shot was fatal[.]" Moreover, defense counsel encouraged the trial justice to "disregard" the portions of defendant's testimony where he admitted to firing the second shot, because, according to counsel, "[i]t doesn't make sense." Rather, defense counsel argued,

> "A good juror, a good thirteenth juror says Melonie was on the floor at the side of the bed, the Beretta is right in

front of her, the defendant is attacked by Valdez. The defendant shoots Valdez in self-defense, and Melonie is sitting on the floor, sees Valdez falling on top of her son, the person that's spent years protecting her, looking out for her. The woman who owns the guns. Who got the blue card, who knew how to fire the guns, and she fires a shot into the back of Valdez's head while she sees him attacking her son. There's no stippling around the head wound.

"It makes more sense then [*sic*] the defendant running into a second bedroom down the hall, lifting up a mattress, retrieving a gun that he said he hid there, and returning to the room and firing, and hitting Valdez in the back of the head."

We begin our review of the trial justice's decision by acknowledging that the trial justice applied the correct standard for assessing the motion for a new trial and articulated sufficient grounds for denying the motion; therefore, his decision is entitled to great weight and deference. *See Johnson*, 199 A.3d at 1051. In his decision, the trial justice explained that "[t]here never was an issue as to whether the defendant shot and killed Valdez Loiseau. * * * The choices the jury had were between murder and self-defense." Further, the trial justice explained that self-defense was "a very weak defense in this case[,]" because Valdez was a cohabitant and defendant had a duty to retreat. Moreover, the trial justice noted that defendant admitted that Valdez "had no weapon in his possession" when defendant shot him. The trial justice rejected defendant's testimony that Valdez was "tougher and would have overwhelmed him" and explained that "[e]ven if the defendant felt

- 16 -

he was threatened, he had the duty to retreat before resorting to deadly force." Additionally, the trial justice found that defendant shooting Valdez a second time, while he was "lying prone and making gurgling sounds," further undermined any claim of self-defense, as did "defendant's complicit activities in removing the decedent's body, hauling it to Massachusetts with the assistance of James Clark, and lighting it on fire in the hopes of destroying the evidence of a homicide[.]"

For the first time on review, defendant argues that the trial justice misapplied the duty-to-retreat rule; therefore, we need not reach the merits of this argument because it is waived. *See Mensah*, 227 A.3d at 483. The record reveals that defendant made no reference to this argument during the hearing on the motion for a new trial. Nor did defendant object at trial to the jury instruction on the duty to retreat.

Having thoroughly reviewed the record, as well as the trial justice's decision denying the motion for a new trial, we are satisfied that the trial justice articulated adequate grounds for denying the motion and that he did not overlook or misconceive material evidence. Accordingly, we hold that the trial justice properly denied the defendant's motion for a new trial.

# III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction.

The record in this case may be returned to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Xavier Vidot. |
| **Case Number** | No. 2020-84-C.A.<br>No. 2020-18-M.P.<br>(P/18-33AG) |
| **Date Opinion Filed** | June 28, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General |
| | For Defendant:<br><br>Christopher S. Gontarz, Esq.<br>Ferenc Karoly, Esq. |